## THE STATE v. ISAAC S. TALLEY.

*Murder — Malice — Manslaughter — Blockaded Highway — Right to pass through Adjoining Lands.*

Deliberate intention to unlawfully do any bodily harm to another is express malice.

Where such malice prompts the act of violence which results in the death of another, the slaying is with express malice aforethought, and the slayer is guilty of murder of the first degree.

Every homicide done with a deadly weapon, is in law presumed to be a malicious homicide, and is murder, unless done under the influence of sudden passion, or in the lawful defence of the slayer's person, family or habitation.

Murder of the second degree is where there is no actual intention to kill the party slain, and yet the act was a deliberate, cruel one, or done while the accused was committing or attempting to commit a felony.

Manslaughter is the unlawful killing of another without any malice whatever.

A forcible entry into a tract of land, by opening a closed gate, or pulling down fence bars, or cutting through a hedge, or breaking a wall, does not warrant the possessor in resorting to any violence to expel the intruder incommensurate with or out of just proportion to that used or threatened, and before he can kill the trespasser in self defence he must first have used every other means of escape.

In case of a mere trespass, killing the intruder would be murder of the first degree, if the slayer, expecting a dangerous attack, armed himself to repel the trespasser and used said arms without any serious resistance on the trespasser's part.

If a public highway be obstructed by a heavy fall of snow which has filled or blockaded it, travellers along such highways have the right to enter upon and travel across the adjoining lands, whether inclosed or not, in the pursuit of their lawful business, not doing any wanton or unnecessary damage to the possessor or his crops, though it is not for the possessor to say what the route of the public travel across his land shall be, and the owner becomes a wrongdoer in resisting the traveller in this right; and if the owner had prepared himself beforehand with arms, and had gone to the place where the traveler would enter his lands for the purpose, if necessary, of using such arms if any conflict should arise, and such conflict having arisen, had by them slain the traveler, the slaying would be murder.

But if the possessor had used only reasonable resistance to the traveller's passage and was first attacked by him with a deadly weapon, whether club or gun, whereby his life was placed in imminent danger, or enormous bodily harm threatened to his person, he was justified in killing the deceased, if such killing was necessary to save his life, or avert an enormous bodily harm.

(*New Castle, February 13, 1886.*)

INDICTMENT for murder.

On the morning of January 12, 1886, Wesley Hanby started with a load of calves to Edgemoor. The road in front of the farm of Isaac Talley was filled with snow and impassable, and it was necessary to pass through Talley's field. There had been previous quarrels between the men, and on the previous day Talley had told Hanby he should not pass through his wheat field., Hanby started from home with a loaded gun, and when he arrived at the bars through which he wished to pass into the wheat field he there met Talley who resisted his entering the field; a fight ensued in which Hanby raised his gun to fire at Talley, but the gun failed to fire. Talley drew a pistol from his pocket, fired and killed Hanby.

*John H. Paynter*, Attorney General, and *John Biggs*, Deputy Attorney General, for the State, asked the Court to charge the jury as follows:

*First*, That if they believed the road impassable, the deceased had a right to cross the prisoner's land.

*Second*, That even if the deceased was a trespasser the prisoner was not justified in resorting to force, but should have appealed to the law for redress.

*Third*, In order to justify killing on the ground of necessity, the person committing the act must be without fault in bringing about that necessity.

*Fourth,* That a conflict provoked by the defendant cannot be set up in self-defense.

*Fifth,* That the burden of showing self-defense beyond a reasonable doubt rests on the accused, unless it otherwise appears by the evidence.

*Sixth,* That if parties agree to fight, and the blood having had time to cool, they go out for that purpose and death ensues, it will be murder.

*Seventh,* That if the prisoner went to that fatal spot on the morning of January 12th, 1886, intending to kill the deceased, if he undertook to cross the field, he is guilty of murder of the first degree.

*George Gray* and *Levi C. Bird,* for the prisoner, asked the Court to charge the jury as follows:

*First,* If the jury believe from the evidence that the prisoner at the bar had been suddenly assailed and was endeavoring to escape from his assailants, and the assault was of such a character as to produce in the mind of a reasonable man an honest apprehension that he was in danger of being killed or of receiving great bodily harm, the use of an instrument or article not necessarily a deadly weapon by the defendant to delay his pursuers will be excusable, even if it results in the death of one of his assailants.

*Second,* If the jury believe from the evidence that the instrument which produced the death of the deceased was not necessarily a deadly weapon and was used by the defendant in a manner showing no premeditation in procuring it; suddenly, and during an affray, when the defendant was retreating and under great excitement, the law will not imply malice.

Therefore, unless the State has proved to the jury, beyond a

reasonable doubt, express malice, the prisoner cannot be convicted of either grade of murder under our Statute.

*Third,* That if the jury, after a calm review of all the testimony, and regarding it alone, have in their minds a reasonable doubt, such as honest and intelligent men may entertain in this case, of the guilt of the prisoner; that is, whether he cast the stone under a necessity to save his own life, or to prevent the infliction of enormous bodily harm, he is entitled to the benefit of that doubt and should be acquitted.

COMEGYS, C. J., charging the jury :

Where there is a deliberate intention to do, unlawfully, any bodily harm to another, this is malice in fact, express malice.

" The evidence of such malice must arise from external circumstances discovering the inward intention—such as lying in wait, antecedent threats, former grudges, deliberate contrivances, and the like, which are various, according to variety of circumstances."

Where such malice prompts the act of violence which results in the death of another, the slayer is said to have acted with express malice aforethought, and to be guilty of murder of the first degree.

Every homicide, or killing by one man of another, which is done with a deadly weapon, or one likely to do great bodily harm, is in law presumed to be a malicious homicide, and is murder of the first or second degree; unless done under the influence of sudden and immediate passion, or heat of blood, or in the lawful defence by the slayer of himself, his family, or his habitation. There are homicides justified by law, as the hanging of a prisoner by a sheriff in the course of his duty, &c., but it is not necessary to speak further of such.

Wherever homicide with a deadly weapon cannot be excused on the ground of self-defence, or justified by the defence of family or habitation, or shown to have been committed in heat of blood arising in a sudden and unexpected affray, or from such provocation.

as an ordinary person is incapable of enduring, it is a malicious homicide, and murder of one or the other of the degrees thereof.

I have already stated to you what the law calls malice. It is a state of condition of the mind and heart most commonly shown by acts of revenge or of cruelty. This condition is innate wickedness. A man who has it, is said to be bad-hearted, dangerous, revengeful. A good-hearted man is one without this state of the heart. You say of such a one as the latter, he doesn't bear malice. There's the distinction between the two—the one is malicious, in the sense of being revengeful or cruel, the other is not. This kind of malice is that which prompts him who has it, to lie in wait for one who is the subject of his vindictiveness, to assail him with a deadly weapon; to prepare and lay poison for one, or give it to him in his food, &c. It is express malice aforethought—a preconceived, predetermined purpose to kill another, or to do him some enormous bodily harm. Where the circumstances of the death disclose such purpose, then the conclusion cannot be resisted, that the crime is murder of the first degree.

Murder of the second degree is where there is no actual intention to kill the party slain, and yet the act that did it was a deliberate, cruel one, or performed while the accused was committing or attempting to commit a felony in law. In these cases, the homicide is a malicous one—for it shows that depravity of the heart which is maliciousness; but in the absence of evidence of preconceived design to take the life destroyed, it is not by law murder of the first degree, but is murder of the second degree.

I have given you, along with the definition of murder, sufficient I think to enable you to distinguish between the different degrees of that crime; and also to understand that malice is wickedness—the kind of wickedness that can compass, or intend, the death of another, and adopt the means to bring it about, which is express malice; or do some cruel, or felonious act, from which death ensues, which is implied malice.

I will now speak of manslaughter, and the law of self-defence.

Manslaughter is the unlawful killing of another without any malice whatever. The common description of the offence, or rather example of it, is where two men fight upon a sudden affray, and one kills the other with a deadly weapon, in the heat of blood, occasioned by the encounter. In such case, the law, taking account of the infirmity of human nature, treats the offence as of less grade than either of the degrees of murder; but it in no sense excuses the offender. He is still amenable to severe punishment by fine and imprisonment. But, if there be anything in the conduct of the slayer which shows that the killing was not from the passion excited by the conflict, but that such conflict was made the occasion or was sought for the purpose of enabling him to be revenged upon his opponent on account of some prior difficulty, then the offence would not be manslaughter but murder, and that of the first degree.

If there be a long standing quarrel or grudge between two men, and they accidentally meet, and have a fresh quarrel with which the old one has no connection, and one slay the other in the heat of the strife, it is but manslaughter; but if the old grudge had anything to do with the quarrel, the homicide would be murder, and of the first degree, because the old grudge was malice, which found expression in the slaughter. The stroke, or shot, connected itself with the grudge, and was malicious. It was part at least of the passion of rancor that caused the death, and that is enough. Again, where by arrangement two men meet to fight each other, and one is killed, the other is guilty of murder of the first degree, because the fight was premeditated; and as both had gone to it prepared to use deadly weapons, it makes no difference who struck the first blow. Duels are of this class.

All homicides are by law presumed to be malicious where done with a deadly weapon; therefore, in case of a homicide, where the prisoner is shown to have used such a weapon in producing the death of the victim, his guilt of the crime of murder is complete, unless he can show, and the duty to do it is at once cast upon him, that the killing was in the heat of blood in a mutual combat be-

tween his adversary and himself; or that he was obliged to slay him to protect himself from being slain, or receiving great bodily harm ; or to render the same kind of protection to some member of his family ; or defend his habitation against violent and felonious invasion by the deceased. This he must do, although no evidence has been given of any express malice, such as hatred, grudge or revenge.,

Where, however, there is such evidence of a previous quarrel between the parties, producing standing ill feeling, a condition of hostility, if there be proof of facts, or circumstances, to show that such ill feeling, or hostility, was an element of the contest, or was influential in promoting the slaying, the offence would be murder. The question in such case would seem to be, would the prisoner have killed his enemy if there had been no previous hostility between them ? If the answer should be no, then it was not heat of blood produced by the fight that caused the death, but the old grudge. The fight was made the occasion of gratifying previous ill-will or hatred.

The law of defence is shown by a common example, or illustration, thus : If one be suddenly attacked by another with a deadly weapon, or other instrument likely to cause death, or some great bodily harm, or he is so situated that he has no other means of escaping the fury of his adversary than by taking his life, he may take such life ; in other words he may save his own life, or limb, at the expense of the life of his assailant. This is the law of necessity ; the supreme right which all men have of self protection, and which overrides all the law against taking life.

It has doubtless been seen that before this paramount right can be lawfully exercised, it must be made appear that there were no other means of security. If there were, then the slayer would be guilty of crime. If he can retreat from his adversary he is bound to do it, and he may not turn upon and kill him, until retreat will no longer be availing. A man is not to be allowed to kill another because that other is endeavoring to kill him, unless

his life cannot be protected otherwise. He must endeavor in the best manner the circumstances allow to escape him before he can kill him. When one has retreated as far as he can, and effort to do more would endanger his life, he may then become the assailant in his turn, and may slay his enemy. If one endeavor to assail another with a club, or other like weapon, dangerous, or deadly, the party attacked, if there be space about him to do so in, should get out of the way.

This is very hard for a spirited man to do; but the law requires of him, before taking life, that he shall do so, if he can—it taking no account of the difference between men in point of spirit or bravery or their sensitiveness to insult, but requiring of all alike that they shall not kill unless life is incapable of being protected or the body secured against great bodily harm in any other way. The law is very tender of human life and will not allow that of an assailant even to be taken, except under such necessity as has been described. This law of self defence supposes that the attack was unexpected by the slayer; for if, in case of combat, the slayer went into it voluntarily; expected to meet his opponent and prepared himself beforehand with the means to contend with him, the conflict cannot be distinguished from that of a duel, where if one party be killed the other is guilty of murder. So much for the law of self-defence. If the law were otherwise, then revenge or resentment would take the place of self-defence and homicidal crimes would be common—so strong are the passions of men, when avenging the insult of attack. The penalties for homicides are the best protection yet discovered for the security of society.

Not all the influence of moral training, nay of religion itself, would be found so adequate and sufficient for that purpose as the terrors of the law—so deeply rooted in the hearts of men, is the spirit of revenge, which, at some time or other, has been aroused in most of them. Though crimes of extreme violence, such as homicides, are apparently on the increase, at this particular time, yet there are fewer by far in proportion to population than there

were in times past. The strict administration of the law by courts and juries still continues; and while such remains the rule, we may reasonably look forward to the time when human life can be said to be safe in Delaware from personal violence. A strict enforcement of the law is the best security to the people of the State.

The law, with respect to defence of property, is this: When a man is in his own habitation, or dwelling place, and is there violently attacked by one who intends to kill him, or do him some grievous bodily harm, he need not take any steps to get out of his way. As every man's dwelling house is also his castle of defence, or in the eye of the law, he need not retreat at all (he being in contemplation of law in the same situation as one attacked elsewhere than in his own house who has retreated until he can do so no farther by reason of a wall or other obstruction that prevents him), but may slay his adversary thus attacking him. But where the trespass of the wrongdoer is not to the habitation or dwelling, but upon or to the land only, there the law is different. Before he can use any violence to the trespasser, much less resort to a deadly weapon, he must, if he wishes to get rid of him, endeavor to do so by the use of gentle means, such as persuasion or moderate application of force; should resistance be offered, he has the right to oppose to that resistance and use sufficient force to overcome it, but never resort to the use of a deadly or dangerous weapon until it is absolutely necessary to defend himself against such in the hands of the wrongdoer.

An attempt at a forcible entry for a felonious purpose into a dwelling house may be resisted at once by killing the offender, if that be necessary to the defence of it. But a forcible entry into a tract of land, by opening a closed gate, or pulling down fence bars, or cutting through a hedge, or breaking a wall, as it does not denote of itself an intention to do any act of personal violence, does not warrant the possessor in resorting to any violence to expel the intruder incommensurate with or out of just proportion to that used

or threatened.  The law furnishes an adequate remedy for this offence, in punishing such a trespasser, not only with the actual damages the plaintiff has suffered by his wrongful act, but will also authorize a jury to give exemplary damages, or damages by way of punishment for his violent entry, where it has been attended by circumstances indicating a purpose, on the part of the aggressor, to create terror in the mind of the occupier by show of arms, &c.

The law requiring one to avoid contact with an infuriated assailant by retreating from him, if he can, before taking his life, or keeping out of the way of one who intends to attack feloniously, applies also to the occupier of land, be he owner or tenant, upon which a trespass is made, with this qualification, that in the case of an occupier of land, there would be a direct insult given by the act of one entering with arms, which, if resisted, by the use of a deadly weapon, would be placed upon a different footing from that of the other cases supposed.   Much is allowed to the weakness of human nature, as I have before pointed out, in giving way to gross provocation or insult.

This is the law with respect to unauthorized entry upon another's land, and entry attended by circumstances of great aggravation—as a display of arms, &c.   In case of a mere trespass, that is where no violence by the intruder is done or offered, and there is no reason to apprehend any, killing the intruder would be murder, and of the first degree, if facts could be shown that the slayer armed himself to repel the trespasser and use his arms without any serious resistance on the trespasser's part.   The fact of arming would show expectation of a deadly combat; and where one has reason to expect a dangerous attack, and takes no steps to avoid it, but prepares himself for it, and especially if he put himself in the way of it, and then kills his adversay who attacks him, he is not only not justified or excused in so doing, but is punishable for wilful murder.

But there are circumstances under which when they exist, a man has the right to go upon another's land.   Suppose one travelling along a highway or a street (which is a highway) is suddenly

attacked by a ferocious animal, and can only protect himself by entering upon another's land, or into his dwelling house through an open door; or should so enter to avoid the danger of a runaway horse or team upon the highway; the law would protect him in so doing upon the ground of the existing necessity. Suppose also, by some natural occurrence, a public highway should be obstructed, as, for example, by trees blown across it by a tempest, by a great flood which has submerged or drowned it, or by a heavy fall of snow which has filled or blockaded it; in such cases, travellers along such highways have now, and always have had the right to enter upon and travel across the adjoining lands, whether inclosed or not, in the pursuit of their lawful business, on occasions.

This right is called a way of necessity, to which the private right of exclusive possession must yield the whole of the adjoining land, so long as the necessity exists. During the continuance of such necessity—that is, so long as the highway shall remain obstructed—the right of travel, or way of necessity, exists, and may be used by wayfarers without molestation from the occupier. But this right must be exercised so as not to do any wanton or unnecessary damage to him, or his crops; though it is not for him to say what the route of the public travel across his land shall be. Highways "are far the public service," as was said by a great judge, "and if the track be impassable, it is for the general good that people should be entitled to pass in another line."

It is upon that consideration that the trespass is justifiable. But suppose the owner or occupier of the land should forbid the public from using his land as a way of necessity, in case of obstruction of the regular highay; are the public bound to heed him? Certainly not; no more than they would be to obey his order that, in traveling along the public highway bounding his land, they should travel on the other side of the middle line of it and not on his side, where his right of soil is. Such right extends to the middle of the highway, subject to the public easement or right of travel, with which he has no authority to interfere. The way of

necessity then, as I have described it, across or over a private owner's land being the same for the public as that they enjoy upon or over the public roads, or highways, it is evident that the right to forbid the use by the public or some member of it, no more exists in the one case than in the other.

It follows, then, that if such owner should, though upon his own land at the time, undertake to prevent any one, who had occasion to travel the obstructed highway, from entering upon and using his land to avoid the obstruction, he would be willfully endeavoring to hinder or impede such a one from exercising and enjoying a common right to which, as a part of the public, he was entitled. During the continuance of the obstruction to the public road, the owner's land, or such part of it as is necessary to be used in lieu of such road, becomes a public highway like the other. When therefore he attempts to impede any one in using it, he is a wrong-doer; and if such attempt is manifested by personal acts—for example laying his hands upon him to prevent his going upon the land, or stopping him while being there in course of travel, or resisting the other's effort to open a gate across or at the entrance of the way thus made necessary, or to let down the bars at an outlet, he is the aggressor and must take the consequences of anything that befalls, by reason of his unauthorized act.

I do not mean to be understood to say, of course, that the party resisted (that is the traveler) would have the right to kill him instantly, or do him great bodily harm with a deadly weapon; but I do mean to say that the party resisted would have the right to oppose any force used towards him by his opponent, and to use all necessary means to overcome it; and if his life were attempted in the conflict, he would have the right in his own defence, to take that of the aggressor, and if such aggressor had gone into the conflict unarmed, and the supposed trespasser, having arms, sought to slay him, he might slay the other if he could and protect himself under the plea of self-defence. But if he had prepared himself beforehand with arms, and had gone to the place where

the traveler would enter to enjoy the way of necessity, for the purpose, if necessary, of using such arms in any conflict that might arise between them over the right and such conflict arisen and he had used them to the destruction of the traveler, the slaying would neither be justifiable, nor excusable, nor would it be manslaughter, because of the wrongful act of the owner or occupier, in resisting another in his right, and the use of the deadly weapon in the conflict which he apprehended. There is no law that shields a man from legal punishment who is the aggressor in a combat and is armed for it, and who kills his contestant in the course of it. Though his adversary is also armed, he has provoked the contest by his own unlawful act; but for such provocation, there would have been no bloodshed. He, himself, brought it on by his inexcusable conduct, the very condition of things which led to his killing that adversary. The law of self-defence does not apply to any such case.

The propositions on which *Senator Gray* for the defence requested the Court to charge the jury were then taken up as follows :

" *First.* If upon a calm review of all the testimony, and regarding it alone, the jury have in their minds a reasonable doubt, such as honest and intelligent men may entertain in this case of the guilt of the prisoner, that is, as to whether he fired the fatal shot under a necessity to save his life, or to prevent the infliction of enormous bodily harm, he is entitled to the benefit of that doubt, and should be acquitted."

To this the Court said : That it is a correct statement of the law. Apply it to the present case by adding : That if the jury, after a calm review of all' the testimony, and regarding it alone, have in their minds a reasonable doubt, such as honest and intelligent men may entertain in this case of the guilt of the prisoner, that is as to whether he fired the fatal shot under a necessity to save his own life, or to prevent the infliction of

enormous bodily harm, he is entitled to the benefit of that doubt, and should be acquitted. While this answer to the instructions prayed for is given, the jury must not forget what I have before said about the duty upon a party assailed feloniously to escape from his adversary, if he can, before he takes his life.

" Second, That retreating to the wall is not demanded by the law, in order to enable the defendant to avail himself of the plea of self-defence when his assailant is armed with a deadly weapon, or when the attack upon him is manifestly with deadly purpose."

The answer to this was, that it is not the law of this State that a man can take the life of an armed assailant in self-defence, if he can, in any other way as for instance by retreating from him, escape the danger of the assault, but if the assault is of such a nature that it could not be escaped from without imminent peril of life or great injury to the person, no attempt at escape need be made, but the assailant may be instantly killed.

" Third. That if the deceased had the tenchnical legal right to drive his wagon through that field and the prisoner was mistaken in supposing that he had a right to say by which road deceased should cross his land, still, if the deceased attempted in the first instance to enforce his supposed right by violence and a deadly weapon, and thus put the prisoner's life in danger or threatened him with enormous bodily harm, then the prisoner had a right to slay the deceased to save his own life from apparent and imminent danger, or avert the infliction of enormous bodily harm."

This proposition is answered by that portion of the charge I have already given you. But I will say further that the deceased had no right to exercise his authority in common with others of the public, in a violent manner, as by show of arms and threat to use them if resisted; but, supposing he had such right, the prisoner had none to interfere with him in any way, and if he voluntarily

went in his way and opposed him, being armed himself, he cannot justify taking the other's life on the ground of self-defence, because of his unlawful preparation for a contemplated conflict of his interference.

"*Fourth.* That if the jury shall believe that the prisoner was first attacked by the deceased with a deadly weapon, whether club or gun, whereby his life was placed in imminent danger, or enormous bodily harm threatened to his person, he was justified in killing the deceased, if such killing was reasonably neccessary to save his life, or avert an enormous bodily harm."

This was answered :

If the jury believe that the deceased was the assailant and had no right to enter upon the prisoner's land as a wayfarer, and yet intended to force his way through it with his team; and opposed, to the reasonable resistance of the prisoner, the use of a deadly weapon from the effect of the use of which the prisoner would have had no means of escape, he had the right to kill him to protect his own life, or his body from grievous harm.

"*Fifth.* That the right of the deceased to pass over the land at all, depended upon the impassability of the highway, and that the right to such passage began at the place where such impassability existed."

This proposition was assented to, with the qualification that the adjoining land should be accessible from such place; if not, the obstruction may be considered up to the point where the adjoining land could be entered upon.

"*Sixth.* That the deceased had no absolute right to pass over any part of the prisoner's land that he chose, when the prisoner had opened a way that was reasonably passable, and he had indicated and invited both the deceased and others to use it."

The Court assented to this proposition.

"*Seventh.*   That the right in case of an obstruction to a highway, in the public, to pass over adjoining land, is qualified by the obligation to do the owner of such adjoining land the least possible harm."

This was also assented to by the Court.

The charge was conluded by the Chief Justice instructing the jury that if they found the prisoner guilty of any crime whatever, it could not be for murder of either the first or second degree.

Verdict not guilty.