## STATE *vs.* SAMUEL EMORY.

*Criminal   Law—Homicide—Murder—Manslaughter—Self-Defense
—Dwelling House—Castle of Defense—Deadly
Weapon; Use of.*

1.   Murder of the first and second degree, and manslaughter, defined.

2.   Every man's dwelling house is his castle of defense, and when he is vio-
lently attacked in such dwelling house by any one who intends to kill him or to do
him some grievous bodily harm, he need not take any steps to get out of the way,
but may slay his adversary if necessary for his own protection.   In such case, how-
ever, one may not take the life of a trespasser on his premises unless it be to save
his own life or to escape great bodily harm.

3.   In determining whether the prisoner was justified in using a deadly weapon
in self-defense, the jury must be satisfied that the peril or danger was such as would
justify an ordinarily prudent man in taking such measures of defense.   It is not what
a man may see fit to think in such strait, but what an ordinarily prudent man would
do, and what the prisoner reasonably believed from all the circumstances surrounding
him, and known to him, at that time.

*(October 21, 1904.)*

LORE, C. J., and GRUBB and PENNEWILL, J. J., sitting.

*Herbert H. Ward,* Attorney-General, and *Robert H. Richards,*
Deputy Attorney-General, for the State.

*David T. Marvel* and *Josiah Marvel* for the defendant.

At a Court of Oyer and Terminer in and for New Castle
County, beginning October 21, 1904, the defendant, a colored man,
was tried upon an indictment for murder of the first degree, wherein
he was charged with murdering a colored man named Samuel Still,
at No. 17 Peoples street in the City of Wilmington, on the evening
of May 28, 1904.

The evidence of the State tended to show that the prisoner
lived at No. 17 Peoples street with one Viola Johnson "his
woman" and that Still boarded with them; that on the 28th of

May both Still and Emory were at home ; that Still had paid a week's board to Viola Johnson amounting to $2.50 ; that thereupon Emory asked her for one-half of the amount which she refused to give him, and that they quarreled about the division of the board money; that Emory and Still had words and came to blows and fought in the house and back yard of No. 17 ; that Viola Johnson and Still went into No. 16, next door, and Emory also later went into the same house.   That there the quarrel over the board money was renewed between Viola Johnson and Emory, and the occupant of the house, one William Morris, also a colored man, told them that he did not want any quarreling in his house; that Emory then started out of the house, Still following a short distance behind ; that the doors of No. 16 and No. 17 were only about a foot apart and the sills a foot from the ground with no door steps, that Emory swung himself from the door of No. 16 into the door of No. 17, the house where he lived; that at that time Still had stepped out of No. 16 upon the ground and stood with his right shoulder against the space between the two doors, with his left shoulder projecting slightly past the door jamb, his right hand resting upon the same and his left hand in the door-way and one foot upon the sill; that Emory, as he went in the hall of No. 17 turned and said to Still, " You black son son of a bitch, you wait here until I come back and I will fix you" ; that Still continued to stand there but said nothing; that Emory walked down the hall a short distance, picked up a single barrelled shot gun behind the door, pointed it at Still and fired, the shot shattering part of the door jam and part of the load entering Still's body and penetrating his heart; that Still cried " Oh, I am shot " and staggered into No. 16 where he fell unconscious; that from there he was taken by an ambulance to one of the city hospitals, where he died within twenty-four hours from the effects of the said gun-shot wounds ; that Emory immediately after firing the shot walked out of his back door and up an alley-way to No. 6 Peoples street, at which place he was arrested the same evening.

The State's witnesses testified that Still and Emory had no quarrel in No. 16 and that Still at no time thereafter said anything to Emory. The prisoner, however, testified that after the fight in No. 17 he went into No. 16, where Still, Viola Johnson and others were present, and that he asked Viola Johnson if she would give him $1.25 of the board money which she promised to do, and at that time Still said " Tisch " and shook his head at Viola Johnson; that thereupon the prisoner said to Still, " What are you trying to keep her from giving me the money for, she is supposed to be my wife. Your wife lives at No. 6 and I don't try to keep her from giving you money"; that Still said " You don't like me anyhow. You don't want me," and the prisoner said " No, I don't want you"; that Still said, "I don't have to board with you. I done rented a room from Will Morris here"; that the prisoner then said " Well, if you have rented a room from Will Morris, that is your business and not mine. Don't you bother me and I won't bother you"; that thereupon Emory started out of the house and as he reached the entry he looked around and saw Still following him with his right hand on his hip pocket; that he saw him pull a revolver from said pocket with his right hand and change it over to his left hand (he being left-handed); that as Emory swung himself around from the door of No. 16 to No. 17, he said to Still " You damned black son of a bitch, if you come in here I will blow smoke in your face." That Still said, " You damned black son of a bitch, if you come out here I will blow smoke in your face," at the same time putting himself in the doorway in the position already described with his pistol in his left hand; that he snapped the pistol twice at the prisoner, who was then going down the hall-way of No. 17, whereupon the latter grabbed his gun from behind a door, jumped into a room leading off the hall, about eight feet from the front door and, holding the gun in the door-way and pointing at an angle, but not looking into the hall, he fired at random, and that Still thereupon fell mortally wounded.

Several witnesses for the defense corroborated the prisoner's testimony as to the deceased's having a revolver pointed in the hall

at the time he was shot and also as to the language that passed between them at the door of No. 17 as stated by the prisoner. The evidence showed, however, that there was no revolver found on the person of the deceased.

Evidence was introduced on behalf of the prisoner showing that he paid rent for and was the tenant of No. 17 Peoples street, where the shooting occurred.

LORE, C. J., charging the jury:

Gentlemen of the jury:—On Saturday, the 28th day of May, 1904, at No. 17 Peoples street in this city, one Samuel Still was killed by a gunshot wound, which was inflicted by Samuel Emory, the prisoner.

For this homicide the prisoner is indicted for murder of the first degree.

Under the laws of this State there are three degrees of felonious homicide, viz., (1) murder of the first degree, (2) murder of the second degree, (3) manslaughter.

1. Murder of the first degree consists of killing a human being with express malice aforethought, or in perpetrating or attempting to perpetrate any crime punishable with death. That is to say in general, when the murder is committed with a sedate, deliberate mind and formed design to take life. Such design may be shown by the deliberate selection and use of a deadly weapon, by a previous quarrel or grudge, by antecedent menaces or threats. To constitute murder of the first degree it is not necessary that such design should have existed in the mind of the assailant for any considerable length of time prior to the killing. It is sufficient if it so existed at the time of the inflicting of the mortal wound.

2. Murder of the second degree is where there is no such deliberate mind and formed design to take life, but where, nevertheless, the killing is malicious and without justification or excuse;

without any provocation, or without sufficient provocation to reduce the homicide to the grade of manslaughter.

3.   Manslaughter is the unlawful killing of a human being without malice either express or implied.

Malice aforethought is the essence and test of murder; while in manslaughter there is no malice.

Whenever one person is killed by another, the mere killing is presumed to be unlawful and to have been done with malice aforethought, until the contrary appears.

1.   The prisoner admits that he killed Samuel Still, but claims that he did so in self-defense in his own dwelling house, and that therefore the homicide is excusable.

2.   That he killed Still in a sudden brawl or mutual altercation, and in the heat of blood, and may not therefore be convicted of homicide of a higher degree than manslaughter.

We would say as to the claim of the prisoner, that he was in his own dwelling house at the time of the shooting, that there may be doubt whether the law in respect to the defense of property is specially applicable to this case, however clearly it may apply to cases like that of the *State vs. Talley, 9 Houst., 417,* where Talley at the time of the homicide was defending his property against alleged trespassers; still it may be generally laid down as was said by the Court in that case, that every man's dwelling house is his castle of defense, and when he is violently attacked in such dwelling house by any one who intends to kill him or to do him some grievous bodily harm, he need not take any steps to get out of the way, but may slay his adversary if necessary for his own protection. In such case, however, one may not take the life of a trespasser on his premises unless it be to save his own life or to escape great bodily harm.   (*State vt. Hoskin, 1 Houst. Cr. Cas., 116.*)   The reason of this doctrine is clearly explained in *State vs. Patterson, 45 Vt., 308.*

The prisoner pleads self-defense.   This plea, if proven to your satisfaction, will entitle him to a verdict of not guilty.

To escape the consequences of his act in using a deadly weapon in self-defense, the prisoner must show to your satisfaction, that what he did to Still was only for the purpose of saving his own life or to escape great bodily harm; neither fear nor apprehension of death or of great bodily harm will totally excuse one from killing another, but to have effect in law, the danger must be imminent and impending at the instant, and must be real, not imaginary. He must have declined the combat and retreated from his assailant as far as he could do so consistently with his own safety. (*State vs. Hollis, 1 Houst., Cr. Cas., 27.*) A man may defend himself against his assailant, but he cannot do so as he pleases. If one be assaulted with the fist he may not defend himself with a club or a deadly weapon, because the defense is disproportioned to the offense, and if in such defense death ensues, the law implies malice from the character of the weapon used. It is for the jury to de_ termine under all the circumstances of the case, whether the prisoner was justified in using a deadly weapon in self-defense at the time and in the manner proven in the testimony. You must be satisfied that the peril or danger was such as would justify an ordinarily prudent man in taking such measures of defense. It is not what a man may see fit to think in such strait, but what an ordinarily prudent man would do, and what the prisoner reasonably believed from the circumstances surrounding him and known to him at that time.

In case you should decide that self-defense is not established, the prisoner claims further that when he killed Still it was under provocation in a fight or mutual altercation with the deceased and in the heat of blood; and that in any event he may not be convicted of a higher grade of homicide than manslaughter.

In order to reduce the offense to manslaughter, you must decide that the death wound was given by the prisoner upon provocation, in a sudden brawl or altercation between him and the deceased, and in the heat of passion, without time for reflection and deliberation and without cooling time. Where death is produced by a deadly weapon, as in this case, the provocation must be very

great to reduce the crime to manslaughter. No mere words, however insulting or offensive, no defiant gestures or weak assault will constitute such provocation.

Under this indictment you may find the prisoner guilty of murder of the first degree, or murder of the second degree, or manslaughter, or you may find him not guilty—as in your judgment may be warranted and justified by the law and the evidence.

If you conclude from the evidence that at the time the prisoner shot the deceased he did so with a sedate, deliberate mind and formed design to kill, your verdict should be guilty in manner and form as he stands indicted. If you should find there was no such sedate, deliberate mind and formed design to take life but that the shooting was malicious, in cruel and reckless disregard of human life, your verdict should be not guilty in manner and form as he stands indicted, but guilty of murder in the second degree. Should you find that the shooting was not malicious, but was under provocation on the part of the deceased arising in a sudden brawl or fight, and while the prisoner was in hot blood therefrom without cooling time, then your verdict should be not guilty in manner and form as he stands indicted but guilty of manslaughter. But should you believe the shooting was done strictly in self-defense, as defined by the Court, your verdict should be not guilty.

Governed by the law as set forth in this charge, it is now your duty to determine from the evidence in this case whether the prisoner be guilty or innocent; and if guilty, it is for you to determine the grade of the homicide.

In order to convict the prisoner of any offense, it is incumbent on the part of the State to satisfy you beyond a reasonable doubt of the guilt of the prisoner.

A reasonable doubt is not a whimsical, imaginary or possible doubt, but a substantial doubt such as intelligent men may reasonably entertain upon a careful and conscientious consideration of all the evidence.

Verdict, guilty of murder in the second degree.