Robert W. WARRINGTON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Andrew Warrington, Defendant
Below, Appellant,

v.

State of Delaware, Plaintiff
Below, Appellee.

Nos. 72, 2002, 74, 2002.

Supreme Court of Delaware.

Submitted: Nov. 26, 2002.

Decided: Feb. 13, 2003.

Thomas D.H. Barnett, Georgetown, Delaware, for Appellant Robert Warrington.

Karl Haller, Office of the Public Defender, Georgetown, for Appellant Andrew Warrington.

Kim Ayvazian, Department of Justice, Georgetown, for Appellee.

Before HOLLAND, BERGER, and STEELE Justices.

BERGER, Justice:

At issue in this criminal appeal is the scope of the self-defense within a dwelling defense. Defendants below argue for reversal of their first degree murder convictions on the basis that the defense, once triggered, endures even after the intruder no longer poses a threat. We disagree. The relevant statute requires that the defendant have a reasonable belief that the intruder will injure someone within the dwelling. That reasonable belief must exist at the time a defendant acts in self-defense. Thus, after an intruder has been subdued, a jury could properly find that a

killing is not justified as an act of self-defense.

### Factual and Procedural Background

#### A. The Death of Jesse Pecco

Robert Wesley Warrington ("Wes"), then 22, and Andrew Warrington ("Drew"), then 18, are brothers who lived with their father at 100 Port Lewes in Sussex County. Wes owed an acquaintance, Jesse Pecco, approximately $800 for drugs that Wes had consumed instead of selling. In order to partially repay the debt, Wes forged a check from his father's bank account, making it out to himself in the amount of $700. Wes gave the check to Pecco on Friday, August 11, 2000, and the two men agreed to meet on Monday to cash the check.

Pecco did not go to the meeting place. Instead, he drove to 100 Port Lewes, and parked his car directly behind Wes's car so as to immobilize it. Pecco then entered the dwelling through its unlocked front door. Drew, who was upstairs watching television, heard shouts coming from the first floor. When he went downstairs to see what was happening, he found Pecco involved in a physical struggle with Wes. Drew soon realized that the two were fighting over control of a knife that Pecco was holding. Drew struck Pecco from behind, causing him to release the knife. According to Wes, Pecco then had the opportunity to leave the house, but instead chased Drew, who fled up the stairs. Both brothers maintain that Pecco was the aggressor in the fight, and that they believed he posed a threat.

The two brothers testified that they gained the upper hand as Wes stabbed Pecco repeatedly with the knife and Drew struck him repeatedly with a fireplace poker. Ultimately it was determined that Pecco sustained 13 stab wounds, including one that penetrated his left lung, and one that penetrated his heart. Expert testimony at trial revealed that he also suffered eight blunt-force blows to the head, causing a fractured skull and subdural hemorrhaging. Among Pecco's injuries were deep incise stabs to his hands, characteristic of defensive wounds.

During the altercation, a 911 call was made from the Warrington residence. DNA from blood marks found on the telephone used to make the call matched Pecco's DNA. One of these marks was located next to the "one" button on the telephone, indicating that it was Pecco who dialed the emergency number. Drew gave a conflicting account, saying that it was he who dialed the number, only to have Pecco knock the phone from his hands. The jury listened to the sounds of the fight, as recorded on the 911 tape, before reaching its conclusion regarding self-defense. The tape revealed that, towards the end of the fight, Pecco was pleading with the brothers to stop attacking him. He asked, "Why are you guys trying to kill me?" to which one of the brothers responded, "Good reasons." As he died, Pecco said, "Wes, show me some love. Give me a hug before I die. Give me a hug." Testimony demonstrated that Drew responded by kicking him in the face and telling him to shut up.

#### B. Jury Instructions Below

Wes and Drew's (collectively "defendants") defense to the Pecco murder charges was self-defense within a dwelling. Accordingly, the trial judge instructed the jury:

A defense raised in this case is justification.... The defense stems from the defendants' assertion that, at the time in question, their actions were justified. The elements of the defense of justification, in this case, are as follows: (1) That the defendants were in their own dwell-

ing at the time of the incident. (2) That Mr. Pecco was [an] intruder unlawfully in defendants' dwelling at the time of the incident.... (3(b)) That the defendants reasonably believed that Mr. Pecco would inflict [personal] injury upon them....

In considering the [defendants'] reasonable belief ... you may consider whether a reasonable man in the defendants' circumstances would have reasonably believed that the intruder would inflict personal injury upon them. You should, however keep in mind, that it is the defendants' state of mind which is at issue here and that it is only required that they, in fact, believed the intruder would inflict personal injury upon them. If, after considering all the evidence to support the defense of justification, you find that such evidence raises a reasonable doubt in your minds as to the defendants' guilt, you should find the [defendants] not guilty of the crime charged.

At another point in the instruction, the judge clarified,

As to the justification defense of a person unlawfully in a dwelling, if you find Mr. Pecco an intruder unlawfully in the defendants' dwelling and if the defendant overcame Jesse Pecco so that the defendant no longer believed he was in danger of physical injury or personal injury, and therefore, the defendant knew the use of deadly force was no longer necessary, then the continued use of deadly force was not justified. In other words, *if a person is initially justified in defending himself, but then knows that the danger to him has passed then the subsequent use of deadly force is not justified.* (Emphasis added.)

The jury found both Drew and Wes guilty of murder in the first degree, possession of a deadly weapon during the commission of a felony, and conspiracy in the first degree.

Discussion

Delaware's statute defining self-defense within a dwelling provides:

In the prosecution of an occupant of a dwelling charged with killing or injuring an intruder who was unlawfully in said dwelling, it shall be a defense that the occupant was in the occupant's own dwelling at the time of the offense, and:

(1) The encounter between the occupant and intruder was sudden and unexpected, compelling the occupant to act instantly; or

(2) The occupant reasonably believed that the intruder would inflict personal injury upon the occupant or others in the dwelling; or

(3) The occupant demanded that the intruder disarm or surrender, and the intruder refused to do so.[1]

The question presented in this case is whether the reasonable belief that the intruder would inflict injury must be contemporaneous with the forceful actions taken against the intruder. Defendants contend that, once both intrusion and reasonable belief of danger have occurred, the rightful occupant of the dwelling has "license to slay the intruder" without considering whether the intruder has been disabled so as to no longer pose a threat.

The doctrine of self-defense within a dwelling differs from self-defense in other contexts. A defendant attacked outside her home must retreat rather than use deadly force, but inside her own dwelling she has no duty to retreat, even if she

1. 11 *Del. C.* § *469*

could do so with "complete safety."[2] An early phrasing of this doctrine can be found in *State v. Talley*[3]: "As every man's dwelling house is also his castle of defense, in the eye of the law, he need not retreat at all (he being, in contemplation of law, in the same situation as one attacked elsewhere than in his own house who has retreated until he can do so no further, by reason of a wall or other obstruction that prevents him), but may slay his adversary thus attacking him."[4]

In Delaware, the added protection granted to the occupant of a dwelling is not absolute. The statute provides a defense only in three circumstances: when the occupant 1) encounters the intruder suddenly and must act "instantly;" 2) reasonably believes that the intruder will inflict injury; or 3) demands that the intruder disarm or surrender and the intruder refuses. These three circumstances share a common element—the occupant is being placed in immediate peril. The plain meaning of this immediacy requirement is that the statute only affords protection if the occupant is confronted with one of the three circumstances *at the time* the occupant uses deadly force on the intruder.[5]

Nothing in the statutory language or Delaware case law supports defendants' contention that what begins as self-defense can be turned into a license to kill. Defendants rely on several extremely broad self-defense within a dwelling statutes from other jurisdictions in arguing their position. For example, the California statute

provides: "[a]ny person using force intended or likely to cause death ... within his or her residence shall be presumed to have held a reasonable fear of imminent peril of death or great bodily injury ... when that force is used...."[6] Colorado's so-called "make my day" statute provides the occupant of a dwelling immunity from prosecution:

> [A]ny occupant of a dwelling is justified in using ... deadly force[ ] against another person when that other person has made an unlawful entry into the dwelling and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.[7]

Delaware's statute, however, is not comparable to either of these statutes. Moreover, defendants have failed to identify any jurisdiction, including California and Colorado, where an occupant of a dwelling is justified in using deadly force after the intruder has been totally subdued.

### Conclusion

■ Based on the foregoing, we conclude that the "added" jury instruction explaining the limitation on the defense of

---

2. 11 *Del. C.* § 464(e)(2).

3. 33 A. 181 (Del.1886)

4. *Id.* at 182–83; *see also State v. Mills*, 69 A. 841, 843–44 (Del.Super.Ct.1908) ("The owner and occupant may kill the trespasser, if he honestly believes, on reasonable grounds, such killing to be necessary to protect his life or his person against a felonious assault by the trespasser in the course of the conflict

with him in the rightful defense of his dwelling house and property").

5. *See Ryan v. State*, 791 A.2d 742, 743 (Del. 2002) (Language of unambiguous statute is given its plain meaning.)

6. Cal.Penal Code § 198.5

7. § 18–1–704.5, 8B C.R.S. (1986).

self-defense within a dwelling correctly stated the law. Accordingly, the judgements of the Superior Court are hereby AFFIRMED.