*602 OPINION OF THE COURT
Rena K. Uviller, J.
In 1986, defendant-petitioner was convicted after jury trial of first degree- rape and related crimes. Nine years later he moves for an order directing DNA testing of genetic material contained in evidence which was recovered in connection with his trial. He rests his application upon a recent statutory amendment authorizing the court to order such testing after judgment has been entered. (CPL 440.30 [1-a].)[1]
The statute upon which defendant relies was enacted as part of legislation designed to establish standards for State and local government forensic laboratories and to establish a DNA data bank for criminal identification purposes. (See, Executive Law § 995 et seq.) Subdivision (1-a) provides that in cases of convictions obtained before January 1996 (when the accreditation procedures for State and local forensic laboratories became effective) a defendant may obtain a court order directing DNA testing of evidence obtained in connection with the case.
The enactment of subdivision (1-a) reflects legislative recognition of the need for a procedural mechanism whereby convicted defendants can seek exoneration through DNA testing which may not have been available at the time of trial. Before the statute’s enactment, courts confronted with applications for postjudgment DNA testing had to resolve the threshold question of whether authority existed to order the testing. Some courts found such authority in CPL 440.10 (1) (g), which -provides for vacatur of judgment on grounds of newly discovered evidence. (See, People v Callace, 151 Misc 2d 464 [Suffolk County Ct 1991]; People v Chalmers, NYLJ, May 13, 1994, at 37, col 1 [Westchester County Ct].) As the court in Callace reasoned, since DNA testing had not been available at defendant’s trial, its recent availability and general scientific acceptance rendered it "newly discovered.” A defendant’s ap *603 plication for DNA testing was deemed a prelude to moving for vacatur on that ground and was granted.[2]
The incorporation of subdivision (1-a) within CPL article 440 confirms the characterization of DNA test results as potential "newly discovered evidence” which may form the basis for a motion to vacate judgment. (See, CPL 440.10 [1] [g].) Although the Legislature has thus endowed courts with the authority to order DNA testing in a postconviction context, the inartfully drawn statute is confusing regarding the circumstances in which such relief should or must be granted. Since the statute requires testing only where the court has determined that the test results probably would have exonerated the defendant, the statute, if read literally, would require the court to know the result of the test before ordering it. (See, Preiser, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 440.30, 1996 Pocket Part, at 71.)
An alternative statutory reading would require a court to order postjudgment DNA testing on demand. While exoneration of the wrongfully convicted should not be restricted by monetary considerations, automatic testing would impose an unnecessary burden on the State’s resources in cases where the results are unlikely to have had any impact upon the verdict. Neither the statutory language nor its legislative history supports such an undertaking.
A more reasonable interpretation is that the Legislature intended that DNA testing be ordered only upon a court’s threshold determination, in the context of the trial evidence, that testing results carry a reasonable potential for exculpation. In the prestatute cases noted supra, where applications for postjudgment testing were granted, the exculpatory potential was clear. Those cases involved sexual assaults in which the assailant was previously unknown to the victim and the defense was one pf mistaken identification. Under the circumstances of those cases, DNA testing which might have excluded a defendant as the source of certain physical evidence *604 clearly would have helped to vindicate him.[3] The evidence adduced in this case, however, presents a very different picture, in which the exculpatory potential of DNA testing is far from apparent.
It was undisputed at trial that defendant and complainant were known to one another before the crime; they lived in the same apartment complex and had been acquainted for several years. The defense was not one of mistaken identification. Rather, the defendant claimed that the complainant had "made the whole thing up” (i.e., had fabricated a claim of sexual assault and had falsely accused him). (Trial transcript, at 387, 399.)
The complainant, on the other hand, testified to a brutal assault in her apartment during which defendant threatened her with a knife, forced her to undress and sodomized and raped her; that he then tied her arms to the bedpost, bound her legs, gagged and blindfolded her and tried to suffocate her with a pillow. She further related that before leaving he ransacked the apartment and stole jewelry, money and her keys, threatening to return and kill her mother if she reported the crime.
Other witnesses, including the police, corroborated complainant’s bruised and hysterical condition just after the attack and the ransacked condition of the apartment, including the cords hanging from the bedpost which, she testified, the assailant had used to bind her. A physician who examined her the same day also testified to her stricken demeanor, her bruises and to lacerations in her vaginal wall which were consistent with forcible penetration. She identified defendant as her attacker that same day.
Defendant testified on his own behalf and a portion of his criminal history was thus made known to the jury. As noted, he claimed that complainant had fabricated the whole story and had falsely implicated him in revenge for his alleged complicity in the murder of her friend four years earlier; he further called witnesses in support of an alibi defense, maintaining he was elsewhere at the time of the crime.
In addition to the foregoing evidence adduced by the People and the defense respectively, the prosecution also introduced physical evidence which is the subject of defendant’s instant motion for DNA testing. The physician who testified to lacera *605 tions in the complainant’s vagina also prepared a standard Vitullo rape kit of nail, vaginal, oral and hair specimens. The chemist, who tested the kit and other evidence the day after the crime, testified that there was sperm on the vaginal swab, on the victim’s panties and on her bed sheet. The chemist also testified that the precise age of the sperm on the vaginal swab could not be determined; that it could have been a week or two old and hence not a product of the attack. She further stated that the age of the semen on the sheet likewise could not be determined and could have survived a laundering.
The People also introduced blood and saliva samples taken from both the victim and defendant several months after the crime and which indicated that they were both type A secretors — signifying only that defendant could not be excluded as a source of the sperm that was recovered. A more specialized enzyme analysis which potentially could have excluded the defendant as the source was not performed and/or introduced by either the prosecution or the defense.
Under these circumstances, the jury’s verdict clearly represented an evaluation of the relative credibility of complainant, on the one hand, and defendant and his witnesses on the other. In view of the crime’s corroborated violence adduced by the police and the examining physician, including the complainant’s bruised and hysterical condition, the damage to her vagina, and the ransacked apartment, the jury reasonably rejected defendant’s assertion that the complainant had fabricated the entire event. Further, if the complainant indeed had been as viciously attacked as the evidence indicated, it is entirely unreasonable to infer that she would falsely accuse the defendant, thereby allowing the true assailant to remain at liberty with the keys to her apartment. Nor is mistaken identity a possibility, inasmuch as defendant acknowledged that he and the complainant had been acquainted for years.
In this evidentiary context it is unlikely that there would have been a verdict more favorable to the defendant even if DNA tests excluded him as the source of the recovered sperm, in view of the sperm’s indeterminate age. This conclusion is underscored by the equivocal results of the blood and saliva tests, including defendant’s decision not to pursue a then-available enzyme analysis. (As noted, while such an analysis would not have been dispositive of guilt or innocence because of the sperm’s uncertain age, it at least might have excluded defendant as its source.)
In light of this assessment of the trial evidence, I conclude that "if a DNA test had been conducted * * * and if the results *606 had been admitted in the trial resulting in the judgment, there [does not] exist * * * a reasonable probability that the verdict would have been more favorable to the defendant.” (CPL 440.30 [1-a].) Accordingly, defendant’s motion for an order directing DNA testing is denied.

. The statute reads as follows: "In cases of convictions occurring before January first, nineteen hundred ninety-six, where the defendant’s motion requests the performance of a forensic DNÁ test on specified evidence, and upon the court’s determination that any evidence containing deoxyribonucleic acid ('DNA’) was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.”

. (See, Matter of Dabbs v Vergari, 149 Misc 2d 844, 847 [Sup Ct, Westchester County 1990].) There, the court deemed defendant’s application to be "in the nature of a postconviction motion for discovery”. Citing DNA’s high exculpatory potential, the court ruled that defendant had a due process right to discovery and that it extended to the postconviction period.

. At least two of these defendants — Charles Dabbs and Terry Chalmers were exonerated and released from custody based on the results of the DNA testing ordered. (See, People v Rush, 165 Misc 2d 821, 822, n 1.)