Henry J. ANDERSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Isaac Redding, Defendant
Below, Appellant,

v.

State of Delaware, Plaintiff
Below, Appellee.

John A. Woods, Defendant
Below, Appellant,

v.

State of Delaware, Plaintiff
Below, Appellee.

Nos. 710, 2002, 641, 2002 and 19, 2003.

Supreme Court of Delaware.

Submitted: June 16, 2003.
Decided: Sept. 4, 2003.

Dean C. Delcollo (argued) and Lisa M. Schwind, Office of the Public Defender, Wilmington, DE, for Appellant.

Paul Wallace (argued), Office of the Attorney General, Wilmington, DE, and Kim Ayvazian, Office of the Attorney General, Georgetown, DE, for Appellee.

William T. Deely, Office of the Public Defender, Wilmington, DE, for Appellant.

Loren C. Meyers, Office of the Attorney General, Wilmington, DE, for Appellee.

Sandra W. Dean, Office of the Public Defender, Dover, DE and Lisa M. Schwind, Office of the Public Defender, Wilmington, DE, for Appellant.

John Williams, Office of the Attorney General, Dover, DE, for Appellee.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE, and JACOBS, Justices, constituting the Court en banc.

BERGER, J.:

## I. INTRODUCTION

Over the past 15 years, scientific evidence from deoxyribonucleic acid ("DNA")

testing has become an increasingly important feature of many criminal cases. First found admissible in Delaware in *State v. Pennell*,[1] DNA testing may be dispositive in determining whether or not a particular individual was the source of a particular sample of biological material.[2] But some criminal defendants were tried and convicted before DNA testing was available, or before DNA testing techniques were sufficiently advanced to allow analysis of a small or somewhat degraded biological sample. To address the possibility that DNA testing could help establish a convicted defendant's innocence, more than half the states in the nation, including Delaware, have enacted statutes providing prisoners the right to post-conviction DNA testing under certain circumstances.[3] To date, such post-conviction testing has led to the exoneration of over one hundred convicted defendants in other jurisdictions.[4]

Delaware's statute, enacted in 2000, sets forth six criteria governing inmates' entitlement to post-conviction DNA testing. For those who were convicted before the statute was enacted, there was a two-year window during which motions for DNA testing could be timely filed. That window expired on September 1, 2002, and appears to have precipitated numerous motions. The three cases that have been consolidated in this opinion are the first to reach this Court for review. We consider them together in order to address several substantive and procedural issues associated with this new statute.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Anderson v. State*

On January 7, 1995, Robert Kyelberg was sitting in his truck on the corner of 7th and Washington Streets in Wilmington, Delaware, when a stranger suddenly climbed into the vehicle and put his hand on Kyelberg's right vest pocket. During the struggle that followed, Kyelberg's eyeglasses were knocked off, and the two men fell out through the truck door. While fighting, Kyelberg noticed a screwdriver and glove fall to the ground. Eventually, Kyelberg managed to climb back into his truck and lock the door. Once the assailant realized that the doors were locked, he left.

Kyelberg drove to a gas station, and the attendant called the police. When the police arrived, Kyelberg described his assailant as a black male wearing blue jeans and a dark jacket, and carrying a screwdriver and a pair of work gloves. Kyelberg warned that he would be unable to provide a positive identification, however, because his glasses had been knocked off.

The police went to the area of the assault, and saw a man, later identified as

---

1. 1989 WL 167430 (Del.Super.) *Pennell* appears to be the first case in which the admissibility of DNA testing was disputed and a trial court decided the issue by written opinion. DNA test results were used in some earlier trials without objection.

2. *See, e.g., Warrington v. State*, 2003 WL 21100667 (Del.Supr.) (DNA used by the State to show that blood sample matched the murder victim's blood); *Vanlier v. State*, 2002 WL 31883016, *2 (Del.Supr.) (DNA testing led to a stipulation by the State that the defendant was not the source of biological material collected by investigators.)

3. *See*, Holly Schaffter, Note, *Postconviction DNA Evidence: A 500 Pound Gorilla In State Courts*, 50 Drake L. Rev. 695, 709 (2002); *http://www.innocenceproject.org.* (listing relevant state legislation).

4. Kathy Swedlow, *Don't Believe Everything You Read: A Review Of Modern "Post–Conviction" DNA Testing Statutes*, 38 CAL. W.L. REV. 355, 355 (2002); Schaffter, *supra* at 697.

Henry J. Anderson, who matched Kyelberg's description. When the police detained Anderson, he threw a pair of work gloves to the ground. The police seized the gloves, as well as a screwdriver that Anderson was carrying. As the police were arresting Anderson, they noticed blood on Anderson's face and on his boots.

Anderson's boots, work gloves, and screwdriver were sent to an F.B.I. laboratory in Washington, D.C., where they were subjected to a form of DNA testing known as restriction fragment length polymorphism ("RFLP") testing. The results were inconclusive. Special Agent Michael Vick, of the F.B.I., testified that the likely reason for the inconclusive results was either that there was not a large enough sample, or that the blood was degraded. Before Anderson's first trial, in 1996, he was given the opportunity to obtain further testing of the blood samples, but that opportunity also included a risk. As his lawyer explained:

> [P]erhaps if further testing would result in exculpatory evidence, then that would be the only reason why the defense would perhaps wish to have further testing done.

> And that is Mr. Anderson's call.

> Perhaps, it could turn around and bite him as well ... so that's a decision Mr. Anderson would have to make....

Anderson decided to forego further testing, and was convicted of attempted robbery in the first degree.

In August 2002, Anderson filed a motion for post-conviction DNA testing. Anderson claimed that short tandem repeat ("STR") DNA testing was not "widely available" at the time of his initial trial, and that STR testing is capable of returning reliable results even from blood samples that are small or degraded. The

trial court denied Anderson's motion, finding that he failed to show: (1) that the technology was unavailable at the time of the trial; (2) that the samples had been subject to a chain of custody sufficient to establish that they were not substituted, degraded, or altered in any material aspect; or (3) that the requested testing had the scientific potential to produce new, noncumulative evidence materially relevant to his assertion of actual innocence.

### B. *Redding v. State*

At approximately 2:00 a.m. on May 18, 1988, an intruder forced his way into Diana Wendell's[5] apartment building and raped her. After the attack, the assailant warned Wendell not to contact the police and then left the apartment. Wendell immediately went to her bathroom to clean herself up. In that process, she threw away the underwear she had been wearing. Later that morning, Wendell went to the police station. Because the rape took place in dim lighting, however, Wendell was unable to describe her assailant beyond noting that he had a scar across his face. Approximately three months later, a man again forced his way into Wendell's apartment. The two struggled, and Wendell managed to call for help through an open window before the intruder pulled her away from the window. He identified himself as the assailant from the previous assault by telling her that he would "fuck [her] like he did the first time."

Eric Lloyd was passing by Wendell's apartment and happened to hear her scream. He called the police and remained on the scene. The intruder had forced Wendell to perform various sexual acts, and was attempting vaginal intercourse when the police burst through the back door of Wendell's apartment. The

5. A pseudonym assigned by this Court pursu-    ant to Rule 7(d).

intruder ran out through the front door, but the responding officers gave chase and captured the fleeing man, later identified as Isaac Redding, on the street outside.

One of the pursuing officers, Officer Strawbridge, testified that he never lost sight of Redding from the time he first saw Redding in Wendell's apartment to the time he apprehended Redding outside the building. In addition, the passerby, who was watching from the street, testified that he saw a man run out the front door of Wendell's building, and then saw a police officer follow and apprehend him. Wendell also identified Redding, when shown photographs shortly after the second attack. She stated that the person she identified from the photograph was the same person who had attacked her in May.

At trial, Redding testified that he had known Wendell's husband for approximately fifteen years, and that he had met Wendell—thus explaining why she was drawn to his picture in the photo lineup. His alibi for the first attack was that he was babysitting the daughter of Lana Hickman at the time. Hickman, Redding's girlfriend, corroborated his testimony. With respect to the second attack, Redding testified that he had been drinking alcohol with friends approximately seven blocks from Wendell's apartment. When he noticed how late it was, he decided to run home along a path that brought him near Wendell's apartment. As he was running, a police officer jumped him.

The jury convicted Redding on all charges and he was sentenced to four life terms. In June 2002, Redding filed a motion seeking DNA testing of two slides containing vaginal material taken from Wendell during the investigation of the two attacks. The trial court denied his motion, finding that the requested testing did not have the scientific potential to produce new, noncumulative evidence materially relevant to Redding's assertion of actual innocence.

### C. *Woods v. State*

On November 5, 1995, Laura Woods called the police to report that her daughter, Rebecca[6], had been sexually molested by her husband, Rebecca's father, John Woods. The same day, a police officer interviewed Rebecca and she recounted multiple molestations. As a result, John Woods was arrested and charged with 37 counts of unlawful sexual intercourse in the first degree, 32 counts of unlawful sexual contact in the second degree, and 3 counts of unlawful sexual penetration in the third degree.

At trial, Rebecca testified to numerous instances of sexual abuse by her father. In her testimony, she stated that he occasionally would have intercourse with her in her bed, and occasionally would ejaculate outside her vagina and onto her stomach. Rebecca testified that, during the period of abuse, Woods prohibited her from having boyfriends, or even speaking to boys on the phone. The State introduced into evidence Rebecca's bedspread, and an expert testified that white stains on the bedspread contained a number of human sperm cells. In addition, Dr. Allan De-Jong testified that he had examined Rebecca and found an enlargement of her vaginal opening, and damage to her hymen, both apparently the result of repeated sexual intercourse, and consistent with Rebecca being sexually active.

At a hearing outside the presence of the jury, Woods elicited testimony from Kim Milnick, a friend of Rebecca's. Milnick testified that, during the period of alleged abuse, she had at least one conversation

---

6. A pseudonym assigned by this Court pursu-

ant to Supreme Court Rule 7(d).

with Rebecca in which Rebecca stated that she had had sexual intercourse with a boyfriend. Rebecca testified and denied having had sex with a boyfriend during the time in question. Although Milnick's testimony, if believed, could explain the semen stain on Rebecca's bedspread and Dr. De-Jong's medical findings, the trial court excluded the testimony under the rape shield statute because the evidence of Rebecca's prior sexual activity was not sufficiently strong.

On February 27, 1998, Woods was convicted of six counts of unlawful sexual intercourse in the first degree, one count of unlawful sexual contact in the second degree, and three counts of unlawful sexual penetration in the third degree. He was acquitted of the remaining 62 charges against him. In June 2002, Woods filed a motion for post-conviction DNA testing of the semen stain from Rebecca's bedspread. The Superior Court denied the motion on the grounds that Woods failed to demonstrate that the requested testing was not available at the time of trial; failed to show that identity was an issue; and failed to establish that the testing would be materially relevant to his claim of actual innocence.

## III. DISCUSSION

### A. Statutory Analysis

The statute governing prisoners' entitlement to post-conviction DNA testing, § 4504(a), provides that:

■ [A] motion … may be granted if:

(1) The testing is to be performed on evidence secured in relation to the trial which resulted in the conviction;

(2) The evidence was not previously subject to testing because the technology for testing was not available at the time of the trial;

(3) The movant presents a prima facie case that identity was an issue in the trial;

(4) The movant presents a prima facie case that the evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, degraded, contaminated, altered or replaced in any material aspect;

(5) The requested testing has the scientific potential to produce new, noncumulative evidence materially relevant to the person's assertion of actual innocence; and

(6) The requested testing employs a scientific method which is generally accepted within the relevant scientific community, and which satisfies the pertinent Delaware Rules of Evidence concerning the admission of scientific testimony or evidence.[7]

Section 4504(a) was intended to "allow [for] overturning convictions if forensic DNA testing not available at the time of trial establishes the innocence of the convicted person."[8] Because of its remedial purpose, § 4504(a) should be liberally construed to allow post-conviction DNA testing whenever the petitioner has complied with a reasonable reading of its requirements.[9] But a liberal construction does not mean that relief should be awarded at

---

7. Del.Code Ann. tit. 11, § 4504(a).

8. S. Bill 329 (Del. 1999) (synopsis); see also 72 Del Laws, Vol. II, Ch. 320 (1999) (enacting the current § 4504(a), and stating that the genesis of the law was Senate Bill 329).

9. See State v. Cephas, 637 A.2d 20, 25 (Del. 1994); Stop & Shop Cos., Inc. v. Gonzales, 619 A.2d 896, 898 (Del.1993).

the cost of twisting or misreading the statutory language.[10]

A petitioner seeking relief has the burden of making some showing to satisfy each of the six statutory requirements. The first requirement seems unlikely to generate a dispute. Petitioner must identify the evidence for which testing is sought, and the evidence must have been secured in relation to the trial.[11] The third requirement, likewise, is relatively straightforward—identity must have been an issue at trial.[12] Identity is always an issue in a criminal trial unless the defendant admits having engaged in the alleged criminal conduct and relies on a defense such as consent or justification. Thus, the trial record should provide the necessary support for this requirement, if it is contested. The remaining four requirements raise more difficult questions of proof and/or interpretation, and will be considered in turn.

### The New Technology Requirement

Section 4504(a)(2) requires a finding that the evidence was not previously tested because the technology for that testing was not available at the time of trial. But DNA testing has changed somewhat and improved over the years. Thus, the question is not simply whether DNA testing was available at the time of trial, but whether there existed a form of DNA testing that could provide conclusive results, given the size and condition of the sample. The major difficulty presented by this "new technology" requirement is the issue of proof.

■ To establish the form of DNA testing (if any) that was available at trial, and the testing now available, petitioner will have to submit evidence to the trial court. If the information can be obtained from reliable scientific literature, petitioner should be able to meet his or her burden by presenting the source materials and asking the trial court to take judicial notice of the relevant facts.[13] If there is any dispute as to those facts, however, petitioner will have to present expert evidence, and a hearing may be required. We recognize that this process may be costly and time consuming, and, to that extent, somewhat inconsistent with the remedial purpose of the statute. The scientific facts must be determined, however. We encourage the trial courts to devise an effective way to make a comprehensive record that will resolve the new technology issue in one or two early cases. That process would eliminate, or at least markedly reduce, the need to hold future hearings on this "new technology" requirement.

### The Chain of Custody Requirement

■ Section 4504(a)(4) requires that petitioner make a prima facie showing that the sample to be tested has been subject to a chain of custody sufficient to establish that it was not materially altered, replaced or degraded. It is normally the State, however, that has custody of the sample and the ability to determine its current condition. Apparently aware of this dilemma, the General Assembly has required only that petitioner make a prima facie showing in support of the chain of custody requirement. A prima facie showing merely requires "enough evidence to allow the fact-trier to infer the fact at issue and

---

**10.** *See Walton v. State,* 821 A.2d 871, 876 (Del.2003).

**11.** § 4504(a)(1).

**12.** § 4504(a)(3).

**13.** *Fawcett v. State,* 697 A.2d 385, 388 (Del. 1997).

rule in the party's favor."[14] We find that, to satisfy § 4504(a)(4), petitioner need only execute or otherwise produce an affidavit stating that the sample was gathered by and remains in the custody of a state agency, hospital, or other institution capable of identifying and securing the sample. If the State contests either the chain of custody or the condition of the sample, the State must provide petitioner sufficient information, including access to the sample, to permit petitioner to develop a factual record for the trial court. This approach allows petitioner to meet the initial burden of making a prima facie showing and, if more evidence is needed, to obtain the relevant facts that often will be in the State's exclusive control.

### The Materially Relevant Requirement

Section 4504(a)(5) is the heart of the statute. It requires that the test have the potential to produce "new, noncumulative evidence materially relevant to the person's assertion of actual innocence."[15] Although all DNA testing statutes are intended to remedy situations in which an innocent person has been wrongly convicted, they differ on how significant or persuasive a favorable test result must be to justify the testing. The New York and Illinois post-conviction DNA testing statutes exemplify two different approaches. The New York statute, the first in the country, provides that post-conviction DNA testing will not be granted unless a court determines that, "if a DNA test had been conducted on [the] evidence, and . . . the results had been admitted in the trial . . ., there exists a reasonable probability that the verdict would have been more favorable to the defendant."[16] Numerous jurisdictions followed New York's lead and enacted statutes with a similar standard for the persuasiveness of exculpatory DNA test results.[17] Even among those states that favor the New York model, however, there is some disagreement over how dispositive an exculpatory test must be.[18]

Illinois was the second state in the nation to enact a post-conviction DNA testing statute.[19] A major difference between the

---

**14.** Black's Law Dictionary 1209 (7th Ed. 1999).

**15.** Del.Code Ann. tit 11, § 4504(a)(2000).

**16.** N.Y.Code Crim. Proc. § 440.30 (2003); *see also People v. Tookes,* 167 Misc.2d 601, 639 N.Y.S.2d 913, 915 (N.Y.1996) (interpreting the N.Y. statute and favoring a reading "that DNA testing [should] be ordered only upon a court's threshold determination, in the context of the trial evidence, that testing results carry a reasonable potential for exculpation.").

**17.** *See, e.g.,* D.C.Code Ann. § 22–4133(d) (2003) (DNA testing authorized if "there is a reasonable probability that testing will produce non-cumulative evidence that would help establish that the applicant was actually innocent. . . ."); Wis. Stat. § 974.07(7)(a),(b) (2003); Idaho Code § 19–4902(d) (2003); Ariz. Rev. Stat. § 13–4240(b) (2003); Cal. Penal. Code § 1405(c)(1)(b) (2003); Fla. Stat. Ann. § 925.11(2)(f)(3) (2003); Mo.Rev.Stat. § 547.035(2)(5) (2003); N.C. Gen.Stat. 15A–269(b)(2) (2003); Tenn.Code. Ann. 40–30–404 (2003); *see also* Va. Code. Ann. § 19.2–327.1(a)(iii) (2003) (post-conviction DNA testing may be granted if "materially relevant, noncumulative, and necessary and may prove the convicted person's actual innocence; . . ."); *c.f.* Swedlow, supra at 367 n. 54, 369 n. 59 (listing post-conviction DNA testing statutes).

**18.** Wisconsin follows New York, but appears to favor lenient application of the model. *See* Kcith A. Findley, *New Laws Reflect the Power and Potential of DNA,* 75 Wis. Lawyer 20 (May 2002). At least two jurisdictions are stricter than New York, and require that the DNA test have the potential to be clearly exonerating. 42 Pa. Cons.Stat. Ann. § 9543.1(c), (d)(2) (2003); Utah Code Ann. § 78–35a–301(e) (2003).

**19.** Schaffter, *supra* at 732.

Illinois and New York statutes is that, instead of following New York's reasonable-probability-of-a-different-result rule, the Illinois statute requires only that "the result of the [requested] testing ha[ve] the scientific potential to produce new, non-cumulative evidence materially relevant to the defendant's assertion of actual innocence;...."[20] Delaware, along with several other jurisdictions, followed the Illinois framework.[21]

■ Because the Delaware statute was modeled after the Illinois statute, that state's case law is highly persuasive in determining the meaning of § 4504(a)(5). In *People v. Savory*, the Illinois Supreme Court overturned a lower court's determination that post-conviction DNA testing "is available only in cases where the proposed scientific testing will, by itself, completely vindicate a defendant."[22] The *Savory* court decided the meaning of "materially relevant" by reference to dictionary definitions and held that, "evidence which is 'materially relevant' to a defendant's claim of actual innocence is simply evidence which tends to significantly advance that claim."[23] We adopt that definition in construing the identical language in Delaware's statute.

■ When deciding whether evidence is materially relevant, the trial court must consider not only the exculpatory potential of a favorable DNA test result, but also the other evidence presented at trial.[24]

Thus, if the State presented a strong case, and a favorable DNA test would discredit only an ancillary fact, the testing should be refused. At the opposite end of the spectrum, where the DNA test could exonerate the defendant, it does not matter how strong the other evidence might have been; § 4504(a)(5) is satisfied. Finally, since § 4504(a)(5) demands only that the proposed DNA testing have the "scientific potential" to return favorable evidence, it is irrelevant whether the test is likely to be favorable or not. If testing is otherwise warranted, it should be authorized, no matter how slight the chance that it will, in fact, yield a favorable result.

The Admissibility of the DNA Test

■ The last requirement is that the requested form of testing be "generally accepted within the ... scientific community" and admissible under the Delaware Rules of Evidence.[25] Like the new technology requirement, this provision burdens petitioner with the difficulty and expense of obtaining a scientific expert, unless the admissibility of the test can be established in another way. We encourage the trial courts to rely on other judicial findings and to take judicial notice of appropriate treatises, where possible, to satisfy this requirement. Moreover, since facts relating to the reliability and progress of DNA technology do not vary from case to case, they need not be decided *de novo* by each individual trial court.[26]

---

20.   725 Ill. Comp. Stat. 5/116–3(c)(1) (2003).

21.   Del.Code Ann. tit. 11, § 4504(a) (2003); Ariz.Rev.Stat. § 16–112–202(c)(1) (2003); Minn.Stat. § 590.01(1a)(c) (2003); Neb.Rev. Stat. § 29–4120(5) (2003).

22.   *People v. Savory*, 197 Ill.2d 203, 258 Ill. Dec. 530, 756 N.E.2d 804, 809 (2001).

23.   *Id.* at 810–11.

24.   *Id.* at 811.

25.   Del.Code Ann. tit 11, § 4504(a)(6)(2000).

26.   *Armstead v. State*, 342 Md. 38, 673 A.2d 221, 233 (1996) ("The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view the threshold ques-

## B.  Case Analysis

We now consider the three cases that were combined for this decision.

### Anderson v. State

■ Anderson's case presents an example where the failure to pursue DNA testing at the time of trial forecloses relief under § 4504(a).  At a hearing held before his 1996 trial, Anderson was asked to take a position on whether to seek additional DNA testing of the blood samples found on his gloves, boots, and screwdriver.  Anderson made the strategic decision not to pursue additional testing for fear that the test results would be incriminating.[27] By adopting that strategy, Anderson lost the opportunity to seek post-conviction DNA testing under the statute.

The consequences of Anderson's trial tactic flow not from a general theory of waiver, but from the statute's requirements.  Under § 4504(a)(2), a petitioner is eligible to seek post-conviction DNA testing only if "[t]he evidence was not previously subject to testing because the technology for testing was not available at the time of the trial...." If the reason that DNA testing was not undertaken at trial was not because the testing was unavailable, but because the petitioner did not want to risk an unfavorable result, the petitioner cannot satisfy § 4504(a)(2).[28]

### Redding v. State

In *Redding*, the trial court denied the motion on the ground that the testing could not demonstrate Redding's innocence, because of insufficient evidence that the samples might contain any of the rapist's DNA:

There is no evidence to suggest that Defendant ejaculated at any time during the first [rape], much less that he ejaculated in [the victim's] vagina.  Furthermore, the victim testified that she immediately washed herself and changed clothes after Defendant left her home. She did not report to the police or seek any medical attention until the next day. Thus, requested testing would be meaningless.  The Court finds nothing to suggest that DNA testing of the vaginal material taken after the first incident could show Defendant's innocence.

In regard to the second incident, the victim testified that Defendant had just pulled down his pants and was trying to put his penis in her vagina when the police broke into the apartment and Defendant ran away.  Thus there is no evidence of either vaginal penetration or ejaculation, although there is evidence of oral penetration.... As the Court sees it, this review of the evidence ends the inquiry.  Based on the facts, performance of forensic DNA testing on either or both slides could not demonstrate Defendant's "actual innocence," as required by § 4504(a).[29]

Because Section 4504(a)(5) requires only that the requested test have the "scientific potential" to produce materially relevant

---

tion of reliability as a matter within each trial judge's individual discretion.") (quoting *Reed v. State*, 283 Md. 374, 391 A.2d 364, 381 (1978)).

27.  As noted above, Anderson's lawyer consulted with his client and then advised the court that Anderson did not want additional tests because he was concerned that they "could turn around and bite him."

28.  C.f. *State v. Gisege*, 582 N.W.2d 229, 230 (Minn.1998) (affirming the denial of post-conviction DNA testing on the basis that "the issue of testing was known [to defense counsel] at the time of trial but was not raised then.").

29.  *State v. Redding*, 2002 WL 31411021, *3 (Del.Super.2002) (footnotes omitted).

evidence, doubts as to whether DNA will be found in a given sample should be resolved in favor of testing. In this case, however, it appears that Redding gave the trial court no evidence to establish the "scientific potential" that the samples would contain DNA. On appeal, Redding attached to his brief several publications and one affidavit suggesting that the samples likely would contain the rapist's DNA, even though the victim washed after the first attack and the rapist did not ejaculate in the victim's vagina during the second attack.

■ Normally, and hereafter, a petitioner who fails to present scientific evidence necessary to support his or her claim in the trial court will be denied relief in this Court. Litigants who wait until they are appealing an adverse ruling before mustering all the support they can find for their position, run a substantial risk that their claims will be rejected as not "fairly presented" to the trial court.[30] Because this is a new statute, however, the interests of justice compel us to remand this matter to the trial court for consideration on an appropriately supported record.

### Woods v. State

■ The trial court denied Woods' motion on the basis that it did not satisfy §§ 4504(a)(2), 4504(a)(3), or 4504(a)(5). On the first point, the trial court was hampered by the same failure of proof as the court in *Redding*. Woods provided nothing more to the trial court than a conclusory averment that DNA testing is now successful in many situations where, in the past, the test results were inconclusive. On appeal, Woods argues that mitochon-

drial DNA (mtDNA) testing is the new type of testing he seeks. In this Court, Woods attached to his brief an article explaining the mtDNA testing process and its usefulness in examining small or degraded samples.[31] As with *Redding*, we are constrained to remand this issue for consideration by the trial court, on an appropriate record.

■ The Woods court, however, also rested its decision on two other bases. We conclude that the petition should not have been rejected on either of those alternative grounds. First, the record establishes that identity was an issue at trial. Rebecca identified her father as the person who was abusing her, but Woods denied the charges. Woods maintained that he was not the person who was having sexual contact with his daughter. Given the evidence that Rebecca had sexual contact with someone, the identity of that person—whether it was Woods or someone else—was an issue at trial.

■ Second, applying the standard outlined above, we hold that a favorable DNA test would tend to significantly advance Woods' claim of actual innocence. The most significant physical evidence introduced against Woods was a bedspread from Rebecca's bed that had semen stains. The jury never heard anything about Rebecca allegedly having sex with her boyfriend, because the trial court excluded a friend's testimony to that effect. If DNA testing were to establish that the semen stain on Rebecca's bed came from someone other than Woods, the whole complexion of the trial would be different. The friend's testimony might be admitted, and even if not, Rebecca's credibility could be severely ·

---

**30.** Supr. Ct. Rule 8.

**31.** We note that the article is copyrighted in 1998, which is the year of Woods' trial. Thus,

it is not clear that mtDNA testing was not available. But this is one of the questions the trial court will consider on remand.

eroded. In addition, if there were evidence of Rebecca's sexual activity, Woods could argue that Rebecca fabricated the abuse charges to retaliate for his strictness in not allowing her to have boyfriends. In sum, the requested DNA testing, if found to satisfy § 4504(a)(2), should be allowed.

## IV. CONCLUSION

For the reasons stated, we AFFIRM the trial court's decision in *Anderson v. State,* and REVERSE and REMAND both *Redding v. State* and *Woods v. State* for further action in accordance with this decision.