BRENNAN, J.
¶1 Jose A. Reas-Mendez appeals an order denying his 2017 postconviction motion for DNA testing[1] of a jacket, a kitchen knife, and latent fingerprint cards containing fingerprints lifted from the outside window of the victim's apartment. In 2008, Reas-Mendez was convicted by a jury of armed robbery with the threat of force, armed burglary with a dangerous weapon, and second-degree sexual assault with the use of force. The convictions were in connection with events that occurred in the early morning hours of May 20, 2008, when an intruder sexually assaulted and robbed a 21-year-old college student at knifepoint in her bed and then fled the apartment.
¶2 Reas-Mendez appealed the conviction, asserting that his trial counsel had been ineffective for failing to challenge the out-of-court identification procedures as impermissibly suggestive. State v. Reas-Mendez , No. 2010AP1485-CR, unpublished slip op. ¶12 (WI App Aug. 23, 2011). This court concluded that the "pretrial identification was proper" and affirmed. Id. , ¶20.
¶3 In 2017, Reas-Mendez brought the motion underlying this appeal. He argued that he is entitled to DNA testing of the jacket, knife, and fingerprint lifts because he has satisfied the four conditions of WIS. STAT. § 974.07(7)(a). He argued that if testing showed that his DNA was not found on the items, there is "a reasonable probability he would not have been prosecuted or convicted" in part because the victim's identification was unreliable. The State concedes on appeal[2] that Reas-Mendez satisfied the threshold requirements of § 974.07(2)(a)-(c) and that his postconviction motion is not barred; nonetheless, the State argues that his motion falls "far short ... of satisfying the pleading requirements of [ § 974.07(7)(a) ]."
¶4 The postconviction court concluded that Reas-Mendez had not satisfied the "reasonably probable" requirement of WIS. STAT. § 974.07(7)(a)2. which requires the movant to show that "[i]t is reasonably probable that the movant would not have been prosecuted [or] convicted ... for the offense at issue ... if exculpatory ... testing results had been available[.]" It therefore denied his motion. Reas-Mendez appeals.
¶5 The issue presented in this appeal is what the "reasonably probable" requirement of WIS. STAT. § 974.07(7)(a)2. means. Our supreme court interpreted the "reasonably probable" condition of the postconviction DNA testing statute in State v. Denny , 2017 WI 17, 373 Wis. 2d 390, 891 N.W.2d 144. Jeffrey Denny had sought postconviction DNA testing of twelve items found at the crime scene, and the question presented was whether "[i]t is reasonably probable that [Denny] would not have been prosecuted [or] convicted" of first-degree intentional homicide "if exculpatory [DNA] testing results had been available before the prosecution [or] conviction." Id. , ¶76. The court stated that it was to "assume for purposes of this analysis that if DNA testing were to occur, the results would be 'exculpatory.' " Id.
¶6 Denny had argued that "[t]hree types of DNA test results would create a reasonable probability of a different result: DNA that matches a convicted offender; DNA that excludes Denny and [a co-defendant] on all items; or DNA on multiple items matching the same unknown third party." Id. Our supreme court concluded that in light of the other evidence presented at trial, exculpatory results "may only reveal the identity of others who may have been involved" but that "[f]inding DNA from persons other than Denny-even convicted offenders-would not prove Denny's innocence." Id. , ¶78. It concluded that "the absence of DNA belonging to Denny and [the co-defendant] would not be particularly compelling, either." Id. "The idea that the DNA results Denny seeks would tip the scales and cause police or a jury to reject the substantial evidence against Denny is simply conjecture." Id. , ¶80. It therefore affirmed the order denying his motion.
¶7 This case presents the same question, and we apply the analytical framework set out by Denny . We start by assuming that the results of the testing of the jacket, knife, and latent prints would be "exculpatory" but we interpret what that assumption means in the context of the evidence in this case. We consider the evidence supporting Reas-Mendez's conviction, including that he was found hiding in an attic of a building a hundred yards away from the victim's apartment about eight hours after the crime, and, most significantly, that the victim positively identified him with certainty in a procedure that we previously ruled was not impermissibly suggestive. We conclude that in light of the strength of the evidence, even if DNA test results excluded him from all three items, it is not "reasonably probable" that Reas-Mendez would not have been prosecuted or convicted. See id. , ¶53. We therefore affirm.
FACTUAL BACKGROUND
¶8 The relevant facts were set forth in this court's opinion denying Reas-Mendez's direct appeal. In our opinion we summarized the testimony of the victim, C.C., about the events that occurred after she went to bed on the night of May 19, 2008, as follows:
According to [C.C.]'s trial testimony, "some type of noise" woke her up later in the middle of the night. The television was still on when she woke up. She lay still and looked around. She heard "movement noise" on the floor in her room, looked at the floor, and saw a person on his hands and knees at the edge of her bed crawling towards her. [C.C.] sat up, prompting her intruder to rise and move to the side of her bed, close to her. [C.C.] started screaming.
[C.C.] testified at Reas-Mendez's trial that the intruder was tall, muscular, had a medium build, was wearing a dark jacket and pants, and had a white T-shirt tied behind his head covering his nose and mouth. She could see his eyes, forehead and hair. She also testified that the intruder had a knife in his right hand that was "long" and "really big." She further testified that when she was screaming the intruder told her to "shut up" and to "[g]ive [him] all [her] money." She stated that she stopped screaming, told him where her purse was, and watched as he grabbed it and took her money.
[C.C.] testified that her communication with the intruder was in a mixture of English and Spanish and that the intruder spoke English with a "Spanish dialect." She told the jury that she was still sitting up in her bed when the intruder learned there was no one else in her apartment, at which point he put the knife down and began to climb on top of her. She stated that the intruder attempted to pull down her pajama pants but that she dissuaded him by telling him she was "sick down there" in Spanish. He then moved to rub her breasts and tried to remove her shirt. Although the intruder's face was still covered below his eyes by his T-shirt during this time, [C.C.] stated that the two were "face to face" and that her eyes were open as he was on top of her. She also stated that she told the intruder that he should leave because someone may have heard her scream. He agreed, got up, retrieved his knife and asked, in English, "are you going to tell anyone? Are you going to call the police[?]" The intruder left after she responded that she wouldn't.
[C.C.] testified that she waited for some time before going into the rest of her apartment. She checked her front door and found the deadbolt was locked in place from the inside. Because she had no land line phone, and because the cell phone that had been by her bed went missing after the intruder left, she ran to her sister's home. From there, police were called and the events were reported in the early morning hours.
Reas-Mendez , No. 2010AP1485-CR, ¶¶2-5.
¶9 Police responded to C.C.'s call and interviewed her at her sister's home and processed the crime scene at her apartment. Then later that morning, an unrelated call to police reporting a fight brought police to C.C.'s apartment complex again at 10:13 a.m. As we explained, when police arrived, they were directed to an attic:
Later that morning ... unrelated to the sexual assault, the manager of the apartment complex ... flagged down City of Milwaukee police officer Richard Gordy to report a complaint that someone may be in the attic of the building. The building was about 125 yards from the building in which [C.C.] lived, across a courtyard. Officer Gordy testified that he investigated the complaint and found Reas-Mendez lying in the attic and subsequently arrested him. About five feet from that building, the officer also found a stainless steel kitchen knife with a black handle, along with a man's blue jacket on the ground.
Id. , ¶6.
¶10 The police recovered the knife and jacket from the ground and showed them to C.C. C.C. said the knife blade was the same length as the one her assailant brandished, but she did not see its handle. She said the jacket looked exactly like the one worn by the assailant.
¶11 As we explained in our previous decision C.C. identified Reas-Mendez at a lineup two days after the assault. Id. , ¶7. C.C. had initially been shown a photo array on May 20, 2008, that included Reas-Mendez, and she did not identify him from the photos. Id. She stated that she wanted to view a live lineup, and a live lineup was presented two days later, on May 22, 2008, in which the participants' noses and mouths were covered. Id. Each participant was instructed to ask, in English, "Are you going to tell anyone? Are you going to call the police[?]" Id. C.C. identified Reas-Mendez, the third person presented, as the assailant without waiting to see or hear the fourth man in the lineup. Id.
¶12 After C.C. identified Reas-Mendez in a live lineup, an identification technician was sent to her home to process the external surface of her living room windows for fingerprints. The technician recovered three lifts using black powder and cellophane lift tape, which she pressed onto the prints, lifted them, and adhered them to a white card. The latent print examiner concluded that Reas-Mendez was the source for two of the lifts but that the third lift lacked sufficient quality to establish identity.
¶13 In his earlier appeal, Reas-Mendez argued that he had received ineffective assistance of counsel based on trial counsel's failure to challenge the victim's identification of Reas-Mendez in a lineup and her subsequent in-court identification. Id. , ¶12. Because the details of that identification are also relevant to Reas-Mendez's arguments here, we will briefly describe the earlier appeal's issues and conclusions.
¶14 Reas-Mendez argued that the lineup procedure was impermissibly suggestive because he was the only lineup participant with "a heavy Spanish accent." Id. , ¶19. This court found that C.C. "had a significant opportunity to observe Reas-Mendez up close and in a very personal way during the crime," that "the lineup identification was within a relatively short time after the assault," and that C.C. testified that "her identification of Reas-Mendez was based in large part on his eyes and voice." Id. , ¶¶17, 19. This court also noted that "[t]he lineup photographic records show four men, all of generally the same build, in the same type of clothing, with dark, shoulder-length hair, approximately of the same age, and wearing bandanas covering their faces from the tops of their noses down." Id. , ¶18. We concluded, "the pretrial identification was proper[.]" Id. , ¶20.
DISCUSSION
I. Standard of review and applicable law.
¶15 In this case Reas-Mendez seeks DNA analysis of certain pieces of evidence. He argues that the testing will impeach C.C.'s identification and that it is "reasonably probable" that it will lead to a different trial result. Accordingly, we must interpret and apply provisions of the postconviction DNA testing statute, WIS. STAT. § 974.07. The interpretation and application of a statute present questions of law that are reviewed de novo . See State v. Alger , 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346.
¶16 The State argues that this postconviction motion is akin to other such motions decided by the postconviction court and that therefore we should employ not the usual statutory interpretation standard but the deferential one. It argues that such an approach would be "consistent with how other collateral postconviction proceedings are reviewed in Wisconsin." In such proceedings, a trial court may in its discretion deny a motion if it fails to allege sufficient facts or presents only conclusory allegations, or if the record conclusively shows that the movant is not entitled to relief. See State v. Balliette , 2011 WI 79, ¶¶50, 56, 336 Wis. 2d 358, 805 N.W.2d 334. The State points to a decision of this court holding that an appellate court should review a trial court's denial of a postconviction motion for DNA testing using the erroneous exercise of discretion standard. See State v. Hudson , 2004 WI App 99, ¶16, 273 Wis. 2d 707, 681 N.W.2d 316. It argues that deferential review is also consistent with two statements in Denny concerning the legislative intent of WIS. STAT. § 974.07 : first, that convicted offenders should be held to the standards in the statute and not be permitted to "engage in postconviction fishing expeditions," and second, that crime victims have a recognized interest in "closure" that must be weighed against the convicted person's interest in reopening a closed case. Denny , 373 Wis. 2d 390, ¶¶66, 70 n.16. In Denny , our supreme court stated it was not deciding the proper standard of review to apply to the trial court's decision regarding whether a movant has satisfied § 974.07(7)(a)2. Id. , ¶75. It stated that the claim in question failed regardless of whether it reviewed the decision de novo or using the deferential erroneous exercise of discretion standard. Id. Reas-Mendez argues that regardless of which standard is applied, this court should conclude that the postconviction court erred in denying the motion.
¶17 We adopt the approach of the Wisconsin Supreme Court in Denny , and in this case we decline to decide the standard of review. We conclude that under either standard, Reas-Mendez is not entitled to relief. We will apply the de novo standard of review for purposes of our analysis below.[3]
II. Reas-Mendez's motion does not satisfy the "reasonably probable" requirement.
A. We assume that DNA results would be exculpatory.
¶18 WISCONSIN STAT. § 974.07(7)(a)2., the provision of the postconviction DNA testing statute at issue, requires the movant to show the following:
It is reasonably probable that the movant would not have been ... convicted ... if exculpatory [DNA] testing results had been available before the ... conviction ... for the offense.
(Emphasis added.)
¶19 Reas-Mendez argues that "[i]f exculpatory DNA results are assumed and an accurate understanding of the facts and law are considered, it is reasonably probable that [he] would not have been convicted."
¶20 We start by assuming that DNA testing of the jacket, knife, and fingerprint lifts would be "exculpatory." See Denny , 373 Wis. 2d 390, ¶76. As noted above, Denny had argued that there were three possible results of the DNA testing of each item: "DNA that matches a convicted offender; DNA that excludes Denny and [a co-defendant] on all items; or DNA on multiple items matching the same unknown third party." Id. Denny argued that each of those presumed exculpatory test conclusions created a reasonable probability of a different result. We note that neither the statute nor Denny defines "exculpatory." Rather, the Wisconsin Supreme Court stated only the following in response to Denny's argument:
Whether we are bound to consider each of Denny's hypothetical sets of test results exactly as he has presented them is not settled. For example, the State does not necessarily concede that "exculpatory" means that the DNA would "match[ ] a convicted offender." Regardless, we will assume without definitively resolving the issue that Denny's interpretation of the statute is valid given that it does not change the result in this case.
Id. , ¶76 n.19.
¶21 We will assume the same meaning of "exculpatory" that the Denny court "assume[d] without definitively resolving"-that is, that any of three types of DNA test results would be exculpatory for purposes of WIS. STAT. § 974.07 : a result that matches a known person, a result that excludes Reas-Mendez on all items, or a result on multiple items matching the same unknown third party. We need not resolve the precise meaning of "exculpatory" in this case because, even assuming the DNA test excludes Reas-Mendez and matches a known or unknown third party, the weight of evidence in this case shows it is not reasonably probable that Reas-Mendez would not have been convicted. That is because the items to be tested, in context, are relevant but tangential to the crimes: burglary and sexual assault. Eliminating his DNA from the prints on the outside window, a jacket, and a mask cannot overcome the victim's identification, his proximity to the crime scene shortly afterward, and the fact that he was in hiding.
¶22 We conclude that viewing assumed exculpatory results in the context of the trial evidence is a reasonable way to interpret the statute because (1) the words of the statute limit relief to those situations where it is "reasonably probable" that the movant would not have been convicted if the DNA evidence had been available at the time; and (2) this interpretation balances the burden on the State with the needs of the convicted defendant. As the court stated in People v. Tookes , 639 N.Y.S.2d 913, 915 (N.Y. Sup. Ct. 1996) (interpreting New York's version of the postconviction DNA testing statute):
An alternative statutory reading would require a court to order post-judgment DNA testing on demand.... A more reasonable interpretation is that the Legislature intended that DNA testing be ordered only upon a court's threshold determination, in the context of the trial evidence, that testing results carry a reasonable potential for exculpation.
Id.
¶23 We conclude that the legislature cannot have intended for a convicted defendant to obtain automatic testing merely on the basis of an assertion of innocence combined with the presumption of exculpatory DNA test results. We agree with the reasoning of the Tookes court: "While exoneration of the wrongfully convicted should not be restricted by monetary considerations, automatic testing would impose an unnecessary burden on the state's resources in cases where the results are unlikely to have had any impact upon the verdict." Id.
B. Reas-Mendez fails to show that the presumed exculpatory test results created a reasonable probability of a different trial result when considering the strength of the other remaining State evidence of guilt.
¶24 If the DNA testing sought here is assumed to have exculpatory results, the conviction would rest on two other pieces of evidence: the fact that Reas-Mendez was found hiding in the attic of a building across a courtyard from C.C.'s building about eight hours after the assault, and C.C.'s positive identification in the live lineup. Reas-Mendez makes three arguments that, if the jury was presented with this evidence and with exculpatory DNA results on the three items tested, it is "reasonably probable" that he would not have been convicted. We disagree and address each in turn.
1. Reas-Mendez has failed to show that the presumed exculpatory DNA evidence would outweigh the victim's eyewitness identification.
¶25 First, Reas-Mendez challenges the victim's identification as unreliable. He argues that she had a "limited ability to see the perpetrator" given that he had part of his face covered and her bedroom was lit only by the television, that the lineup procedure was "questionable," and that the successive identification procedures of photo array and live lineup increased the likelihood of misidentification. He cites the social science research regarding the reliability of eyewitness identification. He disavows any intention of relitigating the previously denied claims from his direct appeal and argues that his position is that "the identification evidence was sufficiently vulnerable to attack that exculpatory DNA evidence could indeed overcome it."
¶26 While Reas-Mendez claims he is not re-arguing his previous appellate claim of unreliable identification, he simply ignores our conclusion there that the victim's identification was strong and the police procedures proper. We concluded there that the victim had a significant opportunity to observe her assailant, gave a detailed description of him, and was careful and certain in her identification of him. As we stated:
[C.C.] had a significant opportunity to observe Reas-Mendez up close and in a very personal way during the crime. She described her assailant as tall, muscular, with a medium build, as wearing a dark jacket and pants and as having a white T-shirt tied behind his head covering his nose and mouth. She could see his eyes, forehead and hair at very close range (he was on top of her) with the light from her television set. She also testified that she was "looking at his eyes the whole time because that is the only thing I could see" and stated that Reas-Mendez's eyes were "so familiar" and she could "remember them so well." [C.C.'s] physical description of her assailant is consistent with how Reas-Mendez appears in the lineup photo.... Further, the lineup identification was within a relatively short time after the assault, when details were likely to still be reasonably fresh in [C.C.]'s mind. [C.C.] was assaulted and robbed in the early morning hours of May 20, 2008. The lineup occurred at 4:00 p.m. on May 22, 2008. She testified at trial that when she made the lineup identification, she "was really certain. I knew it was him ... No doubt it was him."
Reas-Mendez , No. 2010AP1485-CR, ¶17.
¶27 Likewise we concluded that the identification procedures of the police were proper and not suggestive:
There was nothing inherent in the lineup process in this case that causes us to fear "a very substantial likelihood of irreparable misidentification." The police made reasonable and effective efforts "to conduct a fair and balanced presentation of alternative possibilities for identification."
....
We conclude that Reas-Mendez has failed to show that the lineup identification was the result of any suggestive techniques or that such identification, in the totality of the circumstances here, was infected with the "likelihood of misidentification" which would deprive Reas-Mendez of due process.
Id. , ¶¶18-20 (citations omitted).
¶28 As to Reas-Mendez's arguments about the social science research on the unreliability of eyewitness identification, this court is aware of the issues surrounding eyewitness identification and precautions taken to avoid procedures that lead to misidentifications. See, e.g., State v. Dubose , 2005 WI 126, ¶35, 285 Wis. 2d 143, 699 N.W.2d 582 (addressing the issue of showup identifications). In response, courts have deemed identifications made under unnecessarily suggestive circumstances inadmissible, leading police to adopt procedures that would avoid unnecessary suggestiveness. See id. ("We recommend procedures similar to those proposed by the Wisconsin Innocence Project to help make showup identifications as non-suggestive as possible."). In this case, we have already addressed the identification procedures employed and, as noted above, deemed them proper. There is no need to conduct that analysis again.
¶29 Accordingly, Reas-Mendez has failed to show any weakness in the identification or that the presumed exculpatory test results on the three items make a different result "reasonably probable."
2. Reas-Mendez has failed to show that the presumed DNA evidence would outweigh his being found hiding in a nearby attic.
¶30 In support of his "reasonably probable" argument, Reas-Mendez also argues that the fact that he was found hiding in a nearby attic eight hours after the assault "is not particularly inculpatory" and the presumed exculpatory DNA evidence would outweigh it. Relatedly he argues that there is a non-inculpatory explanation for his hiding in the attic that the jury did not hear[4] and he assumes, without developing the point, that on retrial the non-inculpatory version would be admitted without the inculpatory details.
¶31 Reas-Mendez's argument regarding the existence of a non-inculpatory explanation is that he was hiding not from police but from two men who had just beaten him. The evidence on which he relies is hearsay statements in two police reports. One report concerns a call from an anonymous female at 9:35 a.m. to report that she had seen "two men beating one man [and] they pulled him into a grey veh[icle] and took[/] dragged him into the building at 8831 N. 96th." The second report is written by Officer Vickie Hall who says that Officer Gordy's verbal report to her was that Officer Corey Strey had observed Reas-Mendez running from the scene of the fight. The evidence he relies on is three layers of hearsay without a clear link to relevance to the "hiding" issue here. Aside from the hearsay problems, Officer Hall's report does not say whether Reas-Mendez was a victim, an attacker, or a bystander. Nor does it rule out the possibility that, if he was the victim, he was hiding from police and his attackers. On that basis alone, the argument fails the "reasonably probable" test.
¶32 But even if he overcame those evidentiary and relevance issues, Reas-Mendez fails to explain how he could bar the State from impeaching his explanation for hiding by showing that he had been evicted and banned from the premises and that tenants had reported he was responsible for numerous thefts and burglaries there. Officer Gordy's verbal report to Officer Hall stated that after police found Reas-Mendez hiding in the common attic shared by residents of apartments at 9720, 9726, and 9734 West Brown Deer Road, the manager told police Reas-Mendez had been evicted from the apartment complex and had been banned from the premises. The apartment complex manager told Officer Hall that there had been complaints from apartment residents about "numerous thefts and burglaries" by Reas-Mendez. Reas-Mendez conclusorily assumes that only the non-inculpatory evidence would come in at retrial, which is an unwarranted-and unsupported-conclusion.
¶33 Reas-Mendez simply fails to develop how he would prove, with admissible evidence, a relevant relationship between the hearsay reports of his running from a scene of an assault to his presence, hiding, in the attic. Presumably he would have to testify at a retrial that he was the one being beaten and that was his reason for hiding. He did not testify at the first trial. It is unlikely that he would testify at a retrial and subject himself to cross-examination. Finally, even if he chose to testify and said that he hid because he was being assaulted, that is hardly non-inculpatory, especially given the eyewitness victim identification. Reas-Mendez's proximity to the scene of the assault on the following morning, hiding in an attic, is in itself inculpatory, regardless of whether he was involved in an unrelated fight or not.
¶34 More importantly, Reas-Mendez's "non-inculpatory explanation" argument asks us to apply the "reasonably probable" test based on evidence that was not offered at his trial but that he assumes he can offer at retrial. We do not read Denny to support such an analysis. The court in Denny evaluated the evidence actually offered at Denny's trial and determined even exculpatory DNA results would not change the result. Id. , 373 Wis. 2d 390, ¶80. Here the jury heard that Reas-Mendez was found hiding in the attic across the courtyard eight hours after the assault. Even with exculpatory test results, this is compelling evidence of his guilt.
3. Reas-Mendez fails to support his argument that DNA testing of fingerprint lifts is necessary because classical fingerprint comparison analysis is unreliable identification evidence.
¶35 Finally, Reas-Mendez argues that DNA testing of the latent prints is scientifically more reliable and "could prove that the fingerprint match was wrong."
¶36 The latent print examiner testified that he was given three lift cards showing fingerprints. He stated, "One of the lift cards I determined was not suitable for comparison." He testified that as to lift number one, "There were two impressions on lift number one that I concluded matched two fingerprints from Jose Reas-Mendez." As to lift card number two, he testified, "That impression matched the left palm of Mr. Jose Reas-Mendez." On cross-examination, he stated as to the fingerprints on lift card number one, "They were very good quality latent fingerprints and pretty complete."
¶37 First, in accord with Denny , we assume for purposes of applying WIS. STAT. § 974.07, that the DNA test results of the fingerprint lifts would be exculpatory. That would at least mean that the test results would show something other than a positive match of the DNA profile from the fingerprints with Reas-Mendez.
¶38 Citing research on erroneous identifications made based on classical fingerprint comparison analysis,[5] he argues that "it is undisputable that the DNA test results would outweigh the fingerprint comparison results as more reliable and therefore more compelling." First, the assertion that fingerprint analysis is not reliable is contravened by his own sources. Nor do his cited examples support the proposition that DNA testing is needed to correct misidentification of fingerprints by latent print examiners; rather, in every case described in his supporting materials, the misattributed fingerprints were re-examined using classical fingerprint analysis, which showed the error. And second, if that were the standard, no conviction based on fingerprint identification could stand without confirmation of the prints by subjecting them to DNA testing.
¶39 There is no legal or scientific basis for asserting that fingerprint comparison analysis is inherently unreliable or that DNA testing of clear fingerprint lifts is needed to obtain reliable identifications. The authors of an article Reas-Mendez cites on DNA testing of latent fingerprints[6] emphasized the continued validity of classical fingerprint comparison analysis and commended DNA testing not as a replacement for such identifications but rather as an alternative where a lack of clear latent prints made such analysis impossible. They stated:
Since their discovery, latent fingerprints have not lost any of their importance , and the search and archiving of fingerprints is still one of the most important procedures during criminalistics investigation. Unfortunately, the curve and loop patterns are often blurred, and the fingerprint can not be typed in the classical manner.
(Emphasis added.) They concluded even more directly: "[O]f course, genetic identification should not be used instead of classical fingerprint analysis, but rather be used to supplement this. However, if fingerprints found at a crime scene cannot be classically analyzed , they can still be used as a possible DNA source for forensic investigation[.]" (emphasis added). Here the prints were classically analyzed and Reas-Mendez has not challenged their testing process or results at any time in this appeal.
¶40 In any event, we assume as required that the DNA testing of the fingerprint lifts would be exculpatory. However, we apply the interpretation of WIS. STAT. § 974.07 in the same way that Denny did, and we thus conclude that in light of the other evidence presented at trial, exculpatory results "may only reveal the identity of others who may have been involved" but that "[f]inding DNA from persons other than [Reas-Mendez]-even convicted offenders-would not prove [Reas-Mendez's] innocence[.]" See id. , 373 Wis. 2d 390, ¶78.
¶41 Similarly, we conclude that the absence of DNA belonging to Reas-Mendez "would not be particularly compelling, either." See id. This is because the items to be tested are of circumstantial value (and in the case of the knife and jacket, of marginal value) to the State. C.C. said only that the knife and jacket looked like the ones from her assault. And as to the finger and palm prints, they were from the outside of a window. Even if DNA on the jacket, knife, and prints on the outside of the window were found to match another individual and not Reas-Mendez, it "would not be particularly compelling[.]" See id. In Denny , our supreme court questioned whether exculpatory DNA testing of items found at the crime scene would "displace[ ]" the evidence provided by the State at trial, comparing it to the exonerating evidentiary power of "DNA testing ... involving a semen match in a single assailant sexual assault." Id. , ¶81. None of these three items is comparable to the exonerating significance of a semen match and none compares in significance to the victim's eyewitness identification or Reas-Mendez's apprehension across a courtyard, hiding, shortly after the assault. Reas-Mendez's argument that it is "reasonably probable" that he would not have been convicted if the jury had seen exculpatory DNA results from the knife, jacket, and fingerprint lifts is "simply conjecture." See id. , ¶80.
¶42 We conclude that the "reasonably probable" requirement has not been satisfied.[7]
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

Under certain conditions, Wis. Stat. § 974.07(2)(a)-(c) (2015-16) permits a convicted person to seek an order of the trial court for forensic DNA testing of evidence if it is (a) relevant, (b) in the government's possession, and (c) not previously tested.
Under Wis. Stat. § 974.07(7)(a), a court "shall order forensic [DNA] testing" if such a movant satisfies four listed conditions:
1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).
2. It is reasonably probable that the movant would not have been prosecuted [or] convicted ... if exculpatory [DNA] testing results had been available before the prosecution [or] conviction[.]
3. The evidence to be tested meets the conditions under sub. (2)(a) to (c).
4. The chain of custody of the evidence to be tested establishes that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the evidence, the testing itself can establish the integrity of the evidence.
All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

In its response to Reas-Mendez's motion in the trial court, the State conceded that as required by Wis. Stat. § 974.07(2)(b) and (c), the items to be tested were in the State's possession and had not previously been subjected to DNA testing. Its position on the relevance requirement of § 974.07(2)(a) was that the evidence is "not relevant to the investigation or prosecution that resulted in his conviction, except in ways that are detrimental to [Reas-Mendez]" (emphasis added). The State does not pursue this line of argument as to § 974.07(2)(a) on appeal. Its brief states, "The State agrees that Reas-Mendez's motion satisfied the requirements of § 974.07(2)(a)-(c)."

Because we review the motion de novo , we need not address Reas-Mendez's arguments concerning errors in the postconviction court's analysis.

Reas-Mendez has not claimed that the trial court erred in admitting the evidence.

See, e.g., Simon A. Cole, More Than Zero: Accounting for Error in Latent Fingerprint Identification , 95 J. Crim. L. & Criminology 985 (2005) (discussing twenty-two "known cases of fingerprint misattribution" from the United States and England between 1920 and 2004, including cases where the erroneous attribution was discovered prior to conviction).

M. M. Schulz & W. Reichert, Archived or directly swabbed latent fingerprints as a DNA source for STR typing , in Forensic Science International 127, 128-30 (2002).

The State also argues that as to the jacket and the knife, the requirements of Wis. Stat. § 974.07(7)(a)4. concerning chain of custody has not been satisfied. Because we resolve this case on grounds that § 974.07(7)(a)2. 's requirements have not been satisfied, we need not reach those arguments. See State v. Denny , 2017 WI 17, ¶73, 373 Wis. 2d 390, 891 N.W.2d 144 ("Because this provision is fatal to Denny's claim, we need not address whether he has satisfied other portions of the statute.").